70 P.3d 163 (2003)
117 Wash.App. 241
In re DEPENDENCY OF E.L.F., (dob: 03/02/2000).
State of Washington, Respondent,
v.
Terri Fletcher, Appellant.
No. 50441-0-I.
Court of Appeals of Washington, Division 1.
June 9, 2003.
*164 David Donnan, Oliver Davis, Washington Appellate Project, Seattle, WA, for Appellant.
Elizabeth Berris, Seattle, WA, for Respondent.
BECKER, C.J.
A court found Terri Fletcher's son dependent after concluding that his failure to thrive was the result of Fletcher's abuse or neglect. She appeals, and argues that the record shows only that she failed to respond to the inconsistent messages of social workers about nutrition. We find, however, that substantial evidenceincluding the testimony of physicianssupports the court's determination that the boy's growth pattern was not healthy and demanded intervention which Fletcher refused to provide. The evidence sufficiently demonstrated a clear and present danger to the child's health, welfare, and safety. Accordingly, we affirm.
The child, E.F., was born on March 3, 2000. At birth he weighed 5 pounds 13 ounces, and as he grew he generally tracked near the fifth percentile in his growth curve. At the age of 15 months, he stopped gaining weight. Between September and November 2001, the Department of Social and Health Services received a number of referrals expressing concern about the baby's low weight. Fletcher brought the child to Northwest Hospital for a checkup on November 27, 2001. Emergency room staff, concerned about their findings of malnutrition, dehydration, and a low blood platelet count, referred E.F. to Children's Hospital. Children's Hospital allowed the boy to return home with Fletcher, on the condition that she bring him back the following day. When she did not bring him back, Child Protective Services filed a dependency petition.[1]
The court conducted a dependency hearing with respect to Fletcher in March 2002, when E.F. was two years old. The trial court found E.F. dependent due to abuse or neglect and the lack of a parent or guardian capable of adequately caring for him. Fletcher appeals from these determinations.
The State initially argues that Fletcher cannot maintain this appeal as a matter of right, based on this court's recent decision in In re Dependency of T.J.B., 115 Wash.App. 182, 62 P.3d 891 (2003). At issue in that case was the rule of appellate procedure that allows an appeal as a matter of right from the "disposition decision following a finding of dependency by a juvenile court". RAP 2.2(a)(5). The appellant attempted to appeal from the order of dependency without regard to the dispositional order. See In re T.J.B., 115 Wash.App. at 183, 62 P.3d 891. We held that the rule does not allow for a direct appeal from an order of dependency separately from the disposition decision. If it did, an unsuccessful appellant could later appeal from the dispositional order, thereby having "two bites at the apple"a result that would "encourage multiple appeals and piecemeal review." In re T.J.B., 115 Wash.App. at 186, 62 P.3d 891.
In the present case, the trial court entered both the order of dependency and the related dispositional order on the same date. Although Fletcher's notice of appeal seeks review of both orders, her assignments of error pertain solely to the findings and conclusions in the order of dependency. The State argues that her failure to assign error *165 to the order of disposition means that she is appealing only the dependency finding, which under T.J.B. is not appealable as a matter of right.
By appealing from the order of disposition, Fletcher brings up for review the finding of dependency. This procedure does not implicate the policy concern expressed in T.J.B. Because Fletcher is bringing a single appeal of both orders, she will not be afforded "two bites at the apple". The Rules of Appellate Procedure are to be interpreted "to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a). A parent may wish to contest a finding of dependency while at the same time agreeing to the service plan and other provisions of the dispositional order. It would be pointless to require an appellant to mount a pro forma attack upon specific provisions of the dispositional order, if the appellant's only real interest is in reversing the finding of dependency and thereby eliminating the dispositional order altogether. Having appealed from the dispositional order in order to bring the dependency finding up for review, Fletcher is entitled to review of the dependency finding as a matter of right.
The trial court acknowledged Fletcher's evident love for her son and strong emotional attachment to him, and the fact that she did not physically abuse the child by hitting or striking him. The court nevertheless concluded that E.F. was dependent because he was "abused or neglected." See RCW 13.34.030(5)(b). "Abuse or neglect" includes "negligent treatment, or maltreatment of a child by any person under circumstances which indicate that the child's health, welfare, and safety is harmed". RCW 26.44.020(12). "Negligent treatment or maltreatment" requires "an act or omission that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child's health, welfare, and safety." RCW 26.44.020(15). A second basis for the dependency identified by the trial court was that E.F.'s circumstances constituted a danger of substantial damage to his development. See RCW 13.34.030(5)(c).
The order of dependency is supported by findings that E.F. was experiencing significant delays in his development. The court attributed the delays to Fletcher's tendency to deny the existence of her son's problems and refuse help in addressing them. Fletcher challenges the findings as insufficient to show that the boy was genuinely in danger or that her care of him amounted to actionable neglect.
We review a claim of insufficient evidence in a dependency case to determine whether substantial evidence supports the court's findings of fact and whether the findings support the conclusions of law. In re Dependency of M.P., 76 Wash.App. 87, 90, 882 P.2d 1180 (1994), review denied, 126 Wash.2d 1012, 892 P.2d 1089 (1995). Evidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence. In re Dependency of M.P., 76 Wash.App. at 90-91, 882 P.2d 1180. In making this determination, this court does not weigh the evidence or the credibility of witnesses. In re Sego, 82 Wash.2d 736, 739-40, 513 P.2d 831 (1973).
The trial court's primary finding was that E.F. failed to thrive while in his mother's care, especially during the second year when his weight "essentially flat-lined". The court also found that there was no likely explanation for the boy's developmental delays other than a deficiency in his home environment.
Fletcher challenges this finding. She refers to her own testimony in which she described E.F. as small but healthy. She theorizes that his failure to gain weight could have been due to genetics, teething, or his preference for pureed foods. She faults the State and its witnesses for attributing the problem to her without ruling out these other possibilities. The record of the trial testimony, however, does not lend itself to a conclusion that the boy's condition was less than serious, or that the observers who became concerned about him were exaggerating his thinness.
One witness was Dr. Talbot, E.F.'s pediatrician, who saw the child regularly from five weeks of age through 15 months. Fletcher *166 points to Dr. Talbot's statement that the boy "was growing parallel to the growth curves" as evidence that he did not consider E.F. to be suffering from a failure to thrive. But that statement was limited to the child's first six months of life. Dr. Talbot testified that E.F. weighed 15 pounds 6 ounces in June 2001, at the age of 15 months, and still weighed only 15 pounds at his next checkup four months later. He further testified that the boy's growth pattern with respect to weight "demands an explanation" and "is not healthy" and that there were no "apparent metabolic abnormalities that would account for [his] growth failure."
Also supporting the key finding was the testimony of Dr. William Walker, a developmental pediatrician who evaluated E.F. in February 2002. He testified that E.F. was behind in speech, language, gross motor skills, fine motor skills, and personal social skills. While in his mother's care between ages 15½ and 20 months, the child maintained reasonable growth in height and head circumference and yet his weight kept falling further and further off of his growth curve. Then, in the three months of foster care immediately following removal from his home, he gained 3.3 pounds. Dr. Walker said he knew of no medical disorder or genetic condition that would explain this growth pattern.
Fletcher contends that no one who testified was able to explain why E.F.'s growth was below the expected growth curve. She argues that a finding of parental neglect should not be based on a child's failure to gain weight unless there has been a complete medical workup ruling out organic causes for the condition. But because the results of lab tests performed during the child's stay at Children's Hospital "were all normal," Dr. Walker did not think additional invasive testing was warranted. Given the evidence of E.F.'s rapid weight gain once he was transferred to foster care, and the physicians' testimony that there were no known organic causes that would explain the child's growth pattern, it was not necessary for the court to be able to explain the cause of E.F.'s nutritional deficiencies more specifically in order to find him dependent. It was a logical inference that the root cause was inadequate care in the home.
Substantial evidence thus supports the trial court's determination that E.F.'s failure to thrive was circumstantial evidence of neglect of a magnitude that constituted a clear and present danger to the child's health, welfare, and safety. Other courts have affirmed findings of parental neglect based on a diagnosis of non-organic failure to thrive where treating pediatricians testified that they found no organic explanation for the child's low body weight and where the child gained weight when removed from the parent's care. See In re D.J.W., 764 So.2d 825, 827 (Fla.App.2000); In the Interest of Jones, 59 Ill.App.3d 412, 418, 17 Ill.Dec. 156, 376 N.E.2d 49 (1978); In the Interest of Walton, 79 Ill.App.3d 485, 487, 34 Ill.Dec. 734, 398 N.E.2d 409 (1979). These features are present here.
Fletcher argues that neither the medical testimony nor the court's findings explain precisely how her son's drop in the growth chart constitutes a "clear and present danger" to his health. While the presentation of the medical testimony could have focused more precisely on this question, the record justified a conclusion that the child was not only small, but dangerously small due to malnutrition.
Furthermore, the trial court's findings established not only that E.F. was failing to gain weight normally, but also that he was failing to thrive in other ways, particularly in language development. The court made numerous findings establishing that Fletcher was not capable of addressing her son's problems adequately if left to do so on her own. Fletcher assigns error to these findings, but we find that all are supported by substantial evidence.
The court found, for example, that E.F. lacks attachment to his mother: "Something is amiss, the child is not pleased, or comforted, to be with the mother." In disputing this finding, Fletcher emphasizes Dr. Talbot's description of E.F. during his checkup at age 15 months as a "very clingy child", and very emotionally drawn to his mother. However, the trial court's finding was with respect to *167 later observations made "during visitation over an extended period of time." A psychologist's parenting evaluation concluded that the boy displayed "poor attachment with his mother", as evidenced by distressed facial expressions when seeing her, avoiding eye contact with her, reluctance to engage in play with her, and showing a desire to end the visit early. Another experienced observer said she had never seen the same level of anxiety toward a parent that E.F. showed toward Fletcher. She stated that during 10 supervised visits E.F. never reached for Fletcher, or asked her to pick him up, or attempted to crawl into her lap. She described one visit where the child cried the entire time and appeared to avoid his mother.
Substantial evidence also supports the court's findings that Fletcher denied that her son had problems and failed to provide necessary medical care. Dr. Talbot said that Fletcher did not bring her son in for any checkups between June and October 2001, even though this was a time when he "should have been seen very frequently." Dr. Talbot also testified that Fletcher did not follow his recommendations to obtain help with the boy's nutrition and to obtain therapeutic day care to address his developmental delays. Fletcher expressed the view that her son "was fine" and did not need such services. Fletcher reportedly told a social worker that the only problem with E.F. was "doctors lying" about him. Upon hearing that a neurological examination had established E.F.'s developmental delays, Fletcher "denied that he had any".
Substantial evidence also supports the finding that Fletcher did not consistently follow through with her son's medical appointments, her own appointments with a psychiatrist, a requirement for drug and alcohol evaluation, and scheduled visitation with E.F. after he was removed from the home. She missed appointments for the services recommended by Dr. Talbot, and failed to return to Children's Hospital with E.F. as she had promised. The psychiatrist testified that she intended to see Fletcher at least once a month for mental health issues, but that Fletcher frequently cancelled appointments or failed to show up. Fletcher missed four of ten scheduled visits with E.F. in December 2001 and January 2002, and improved her attendance only after stricter visitation procedures were imposed. Thus, the court was justified in concluding that the structure of dependency was warranted to ensure consistent attention to the child's essential needs.
Substantial evidence also supports the court's findings that Fletcher demonstrated poor judgment, and engaged in inappropriate and volatile behavior. An investigative social worker with Child Protective Services and a DSHS child welfare service worker both testified that they received scores of telephone messages from Fletcher at all hours. Sometimes Fletcher's words were slurred. Sometimes she yelled angry accusations and threats. In one call, she said she intended to flee with the child rather than engage in services. Medical service providers similarly testified to receiving as many as nine angry, slurred-speech messages in the middle of the night.
Substantial evidence also supports the court's finding of concern and suspicion that Fletcher "may be abusing alcohol or drugs", and the finding of mental health issues that interfered with her ability to parent. Fletcher agreed to random drug and alcohol testing for a 90 day period starting in January 2002. She underwent three tests in the first week, but declined all others, and left a number of incoherent messages for the drug counselor. Another witness who evaluated Fletcher in December 2001 said that she denied having a history of substance abuse yet Fletcher in her trial testimony admitted having such a history. Fletcher's psychiatrist diagnosed her as having atypical bipolar disorder and borderline personality disorder, with symptoms including mood swings, inconsistent emotional responses, volatility, and histrionic behavior. Although the psychiatrist stated she had seen significant progress and was hopeful of seeing more, treatment had been "spotty" due to Fletcher's infrequent visits. The psychiatrist stated that she had not yet effectively managed Fletcher's disorders, and she estimated Fletcher's chance for improvement at 50 percent.
*168 In summary, the trial court's findings are all supported by testimony from various service providers whose attempts to get help to a boy with significant development delays were consistently thwarted by his mother's denials, inconsistency, and active hostility. The court's findings support the conclusions that Fletcher's conduct was a form of neglect that presented a clear and present danger to her son's health, welfare, and safety, and that he was in danger of substantial damage to his development.
Affirmed.
BAKER and COLEMAN, JJ., concur.
NOTES
[1] The Department later amended its dependency petition to allege that E.F.'s father was a registered sex offender. An order of dependency and a dispositional order were entered against the father by default on March 5, 2002.