**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| In re the Dependency of | No. 48777-2-II |
| J.A.G. | UNPUBLISHED OPINION |
| B.D.: 08/27/2001 | |
| A Minor Child. | |

SUTTON, J. — D.G. appeals the juvenile court's order establishing a dependency as to his 14 year old daughter, J.A.G.[1]  D.G. argues that the Department of Social and Health Services (Department) failed to establish a dependency under RCW 13.34.030(6)(c) because the Department did not prove there was a danger of substantial damage to J.A.G.  Substantial evidence support the juvenile court's challenged findings of fact, and the findings of fact support the juvenile court's conclusion of law that J.A.G. is a dependent child.  We affirm the juvenile court's order establishing a dependency as to J.A.G.

FACTS

On September 28, 2015, J.A.G. was removed from her mother's care and placed in shelter care.  The Department filed a dependency petition alleging that J.A.G. was a dependent child based on evidence of methamphetamine use in the home and her mother's recent eviction from her apartment.  At the time J.A.G. was placed in shelter care, her father, D.G., was living in Montana and had not seen J.A.G. in nine years.

---

[1] J.A.G.'s mother, S.G., entered an agreed order of dependency under RCW 13.34.030(6)(c) and is not a party to this appeal.

On February 2, 2106, the juvenile court held a contested hearing on the dependency petition as to D.G.[2] The juvenile court heard testimony from D.G., J.A.G., as well as Kelly Machnik, court services social worker, and Victoria Bingham, the appointed guardian ad litem (GAL).

1. J.A.G.'s testimony

J.A.G. testified that her father left when she was five and she had not seen him since. J.A.G. had spoken to her father three to four times a year for 15-30 minutes. J.A.G. testified that she wanted to be able to return to living with her mother. When asked if she felt the same way about living with her father she stated, "No, not at all, actually," and that she did not want to get to know him any better. Report of Proceedings (RP) at 73. She also testified that:

> [I]f I had to live with anybody besides my mom, that is including my foster mom, [B.], which I really like, I would like the family that I actually know and got to know and lived with, and it's -- I'm sorry. I just can't live in Montana. Like everything I know -- my life is here now.

RP at 73. And, J.A.G. testified that, when the social worker arrived to pick her up from school to go to court, she mistakenly believed that she was being taken to Montana and she "was very scared." RP at 78. In her current placement, J.A.G. stays in the same school, maintains contact with her friends, and has visits with her mother every Friday.

2. Machnik's Testimony

Machnik was the court services social worker who filed the dependency as to J.A.G. Machnik testified that J.A.G. was not placed with D.G. because "there did not appear to be any type of relationship between him and his daughter since he hadn't seen her since she was four or five years old." RP at 85. She also testified that D.G.'s "lack of involvement and his lack of

---

[2] Under RCW 13.34.110(1) the juvenile court shall hold a fact-finding hearing on a dependency petition unless the parties agree to a dependency under RCW 13.34.110(3). At the fact-finding hearing, the petitioner must prove that the child is a dependent child under RCW 13.34.030(6) by a preponderance of the evidence. RCW 13.34.110(1).

knowledge of what was going on was a failure to protect." RP at 85. During her testimony, the following exchange took place:

> [DEPARTMENT]: I think that we have just gone through it a little bit, but would you identify for the Court what you perceived to be [D.G.'s] parental deficiencies?
>
> [MACHNIK]: The parental deficiencies that we would find in this case are basically a lack of an established relationship and that in order to reunify a 14-year-old daughter with her father that she hasn't seen in nine years, we would need to look at services like counseling or some type of help with reunification in order to help them establish a relationship.
>
> [DEPARTMENT]: Do you believe those parental deficiencies pose a risk of substantial damage to [J.A.G.'s] psychological or physical development?
>
> [MACHNIK]: Yes. [J.A.G.] is obviously already struggling with what she is going through in the dependency process and being away from her mother. I am aware that her and her mother have a very close relationship and that this has been difficult for her.
>
> I believe that pulling her completely away from her mother, from her family, from her school and from everything that this child knows, who is a teenager, would be very detrimental to her mental health and her ability to handle that big of a change, especially with what has already happened to her.
>
> . . . .
>
> [DEPARTMENT]: Okay. Is there any specific threats of harm to [J.A.G.] that placement with the dad in this case would pose?
>
> [MACHNIK]: Only to, I believe, [J.A.G.'s] mental health. It could be very damaging to her to place her against her will with a parent that hasn't parented her or, from what I understand, any children in the last almost decade.

RP at 86-87.

Machnik testified that if a dependency were established, D.G. and J.A.G. would be offered services to help facilitate reunification and they would likely be offered individual and then group counseling. Machnik testified that services are meant to identify the damage to the relationship between the parent and the child and to help repair the relationship so there is a possibility of reunification. However, Machnik clarified that the Department cannot provide counseling or other services unless a dependency is established.

3. Bingham's Testimony

Bingham, the appointed GAL, testified that it would be in J.A.G.'s best interests if a dependency was established. When asked if the lack of a relationship between D.G. and J.A.G. posed a danger to J.A.G.'s physical or psychological well-being, Bingham answered:

> Danger is a pretty strong word. I would say that her psychological wellbeing is in question because she is -- it's very clear when you talk to her, you look at her, that she is very scared and fearful about going to Montana. So, yes, I believe that there would be some psychological issues with [J.A.G.] and -- but I also know that [J.A.G.] is willing to start some conversations with her dad and try to establish a little bit of a relationship with him.

RP at 107-08. Bingham also testified that J.A.G. was currently trying to "come to grips with the fact that her dad abandoned her." RP at 110.

4. D.G.'s Testimony

D.G. did not dispute that he had been living out of state and had not seen his daughter in the last nine years. However, he testified that in both 2008 and 2009 he tried to arrange for J.A.G. to visit him but S.G. did not maintain contact with him to make the arrangements. And, phone contact with J.A.G. was irregular because J.A.G.'s mother "has become exceedingly unreachable." RP at 30. D.G. also testified that he was unaware that S.G. may have been using drugs around J.A.G. or that S.G. was losing her housing. He did not attempt to take legal action to see his daughter or to come to Washington. The following exchange also took place:

> [D.G.'s COUNSEL]: I think that you testified in response to questioning from [J.A.G.'s attorney] that talking about social matters, boyfriends, you are not at that point yet?
> [D.G.]: No.
> [D.G.'s COUNSEL]: If the Court didn't find a dependency, the fact that you are not at that point yet, would that affect your ability to effectively parent and safely parent [J.A.G.]?
> [D.G.]: Well, there is not a -- parenting is still -- and I don't mean to just -- I am not going to throw a generalization out there, but parenting is more than just dealing with a perfect child. And I am not going to say my daughter is perfect, but it's coming with -- it comes with good days and bad days.
> And, I understand that there is going to be a lot of work but that work does not mean -- just because of the case -- you know, the workload does not preclude

4

me from being able to raise my daughter. It just means that I have to address some issues, and there is a lot of things to address.

That is not -- you don't give up on something just because it's hard, and I am not going to give up on my daughter just because we have some work to do. Obviously we have work to do. Everybody can see that. That is what we are doing here.

RP at 51-52.

On February 19, 2016, after the contested hearing, the juvenile court found that the Department proved the following facts by a preponderance of the evidence:

1. Between 2006 and 2015, the father [D.G.] went nine years without face-to-face contact with his daughter [J.A.G.]. The father's only visitation was two to four phone calls a year. The father moved frequently, residing in the states of Washington, Georgia, and Montana. Meanwhile, the child resided in Kitsap County, Washington. The child never visited her father in Wisconsin, Georgia, or Montana; the father never visited her in Kitsap County.

2. Between 2006 and 2015, the father provided [J.A.G.] no emotional support and almost no financial support. Around 2006, the father left Kitsap County to visit his mother out-of-state. When the father left Kitsap County, he knew that [J.A.G.] and her mother had then moved into a shelter. Aware of his daughter's homelessness, the father did not return to Washington after visiting his mother. The father did not return to Kitsap County for nine years.

3. There is an obligation as a parent to be actively involved, which includes knowing whether the child is living alongside methamphetamine use or homeless. The child in this case endured both these dangers. The father was unaware. He did not know where or how his daughter was living because, simply, he was not around.

4. The Department filed a petition alleging the child dependent on 9/28/15. The child has since resided in foster care. Following the filing of the dependency petition, the father has travelled from Montana to Kitsap County three times to appear and participate in these proceedings. The father once appeared without visiting his daughter. In two out of three of these appearances, the father did visit. This was the first face-to-face contact between them in nine years. From these visits, it is evident that the father and the child have a ways to go in terms of rebuilding trust and a relationship. Specifically, the father and child need to reconnect and reestablish strong communication in order to be able to address school, friends, social relationships, boys or boyfriends, and the like. To develop, the child needs someone who can help with these issues now.

5. At one appearance, the father objected to his daughter having an extended Thanksgiving visit with her mom and uncle at the uncle's home. The child, the

Department, Guardian ad Litem, and mom were in favor of the visit. The father objected based on a decade's previous interaction with the uncle in which there was purportedly recreational marijuana use and a topless woman. That the father would object to his daughter having some sense of normalcy, to her being with family for the holiday, evidences an inability to understand her or be compassionate for her current circumstances. Further, the suggestion that the dad knew better based on what allegedly occurred a decade ago highlights for the failure to know what is going on now.

6. It is not in the child's best interests to move from Kitsap County to live with her father in Montana. From the child's perspective, when she was five years old, her father left her. This sense of abandonment distinguishes placement with the father from foster care. It would be to the child's psychological detriment to remove her from everything she is familiar with in Kitsap County to go live with the father in Montana--to be placed with a parent, who from her perspective, removed himself from her presence. Placement with the father at this time would be damaging to the child's emotional and psychological well-being.

7. It is commendable that the father has the best of intentions to reconnect and reestablish strong communication with his daughter. But for now, the child has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. Visitation and maybe counseling are necessary to rebuild the father and child's relationship.

Clerk's Papers (CP) 78-79. Based on the findings of fact, the juvenile court found that there was a statutory basis for the dependency under RCW 13.34.030(6)(c) because J.A.G. had no parent or guardian capable of adequately caring for her, such that she is in circumstances which constitute a danger of substantial damage to her psychological or physical development. The juvenile court concluded that J.A.G. was a dependent child and entered an order of dependency as to D.G. D.G. appeals.

ANALYSIS

D.G. argues that the juvenile court's dependency order is unsupported by substantial evidence. Specifically, D.G. assigns error to findings of fact 6 and 7. D.G. also argues that the juvenile court erred by finding that the Department established a statutory basis for the dependency because the Department failed to prove there was a danger of substantial harm to J.A.G.'s psychological or physical development. The juvenile court's findings of fact are supported by substantial evidence. And, the Department met its burden to prove that there was a danger of substantial harm to J.A.G.'s psychological or physical development. Accordingly, the juvenile court properly concluded that J.A.G. was a dependent child under RCW 13.34.030(6)(c). We affirm the juvenile court's dependency order.

I. Standard of Review

Parents have a fundamental liberty interest in the care and welfare of their children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). But the State has an interest in protecting the physical, mental, and emotional health of children. *Schermer*, 161 Wn.2d at 941. A dependency is a preliminary proceeding that does not permanently deprive a parent of rights. *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). Dependency proceedings are designed to help parents alleviate problems that led to state intervention and reunite families if appropriate. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203,108 P.3d 156 (2005).

In evaluating a claim of insufficiency of the evidence in a dependency proceeding, we determine whether substantial evidence supports the juvenile court's findings of fact and whether those findings of fact support the juvenile court's conclusions of law. *In re Dependency of C.M.*, 118 Wn. App. 643, 649, 78 P.3d 191 (2003). Evidence is substantial if, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of

the evidence. *In re Dependency of E.L.F.*, 117 Wn. App. 241, 245, 70 P.3d 163 (2003). Unchallenged findings of fact are verities on appeal. *In re Dependency of P.D.*, 58 Wn. App. 18, 30, 792 P.2d 159 (1990). The legislature has determined that in balancing the legal rights of parents against the rights of the child, that the rights, health, and safety of the child shall be the paramount concern. RCW 13.34.020; *Schermer*, 161 Wn.2d at 942. We do not reweigh the evidence or evaluate witness credibility. *In re Welfare of C.B.*, 134 Wn. App. 942, 953, 143 P.3d 846 (2006).

To find a child dependent, the State must prove by a preponderance of the evidence that the child meets the statutory definition of a "dependent child" under RCW 13.34.030(6). *E.L.F.*, 117 Wn. App. at 245. RCW 13.34.030(6)(c) provides that a child is "dependent" if he or she "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." The dependency standard of proof is "relatively lenient" because a dependency serves the important function of allowing state intervention in order to remedy family problems and provide needed services.[3] *Schermer*, 161 Wn.2d at 942; RCW 13.34.110. There are no specific factors the juvenile court must consider when determining whether a parent is capable

---

[3] In *Schermer*, our Supreme Court stated:

> A dependency based on [former] RCW 13.34.030(5)(c) [(2003)] does not turn on parental "unfitness" in the usual sense. Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. Under [former] RCW 13.34.030(5)(c), it is unnecessary to find parental misconduct in order to find a child dependent.

161 Wn.2d at 944.

of adequately parenting a child. Rather, the inquiry is highly fact specific. *See Schermer*, 161 Wn.2d at 951-52.

A dependency finding under RCW 13.34.030(6)(c) need not be based on proof of actual harm, but instead can rely on a mere "danger" of harm. *Schermer*, 161 Wn.2d at 951. The State does not need to "stay its hand until actual damage to the endangered child has resulted." *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979), *review denied*, 94 Wn.2d 1002 (1980). A juvenile court has broad discretion in determining when there exists a risk of harm. *Schermer*, 161 Wn.2d at 951.

II. Challenged Findings of Fact

D.G. specifically assigns error to the juvenile court's findings of fact 6 and 7. Both are supported by substantial evidence. Finding of fact 6 states:

> It is not in the child's best interests to move from Kitsap County to live with her father in Montana. From the child's perspective, when she was five years old, her father left her. This sense of abandonment distinguishes placement with the father from foster care. It would be to the child's psychological detriment to remove her from everything she is familiar with in Kitsap County to go live with the father in Montana--to be placed with a parent, who from her perspective, removed himself from her presence. Placement with the father at this time would be damaging to the child's emotional and psychological well-being.

CP at 79. Bingham specifically testified that, as the GAL, she believed it was not in J.A.G.'s best interests to move out of Kitsap County. Therefore, the first sentence of the juvenile court's finding is supported by substantial evidence.

The juvenile court also found that J.A.G.'s perception was that her father had abandoned her. Bingham testified that, from J.A.G.'s point of view, her father had abandoned her; J.A.G. testified that her father left her when she was five. Therefore, substantial evidence supports the juvenile court's finding that, from J.A.G.'s perspective, D.G. abandoned her. Because the finding is based on J.A.G.'s perspective, D.G.'s testimony that he tried to arrange visitation with J.A.G.

or that S.G. interfered with his ability to see and communicate with J.A.G. does not undermine the juvenile court's finding.

Substantial evidence also supports the juvenile court's findings that being placed with D.G. would be to J.A.G.'s psychological detriment and would be damaging to J.A.G.'s emotional and psychological well-being. Bingham testified that placement with her father would cause "psychological issues" for J.A.G. RP at 110. And Machnik testified that placement with her father would be "very detrimental." RP at 86. Based on Bingham's and Machnik's testimony, substantial evidence supports the juvenile court's findings.

D.G. also assigns error to finding of fact 7 which reads:

It is commendable that the father has the best of intentions to reconnect and reestablish strong communication with his daughter. But for now, the child has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. Visitation and maybe counseling are necessary to rebuild the father and child's relationship.

CP at 79. A portion of finding of fact 7 is based on the statutory language in RCW 13.34.030(6)(c). That portion of the juvenile court's finding will be addressed in the next section regarding whether the Department met its burden to prove J.A.G. was a dependent child. The remainder of finding of fact 7 is supported by substantial evidence.

D.G. clearly testified that he wanted to be able to parent his daughter and work toward reestablishing a relationship with her. Therefore, substantial evidence supports the juvenile court's finding that D.G. has the "best of intentions to reconnect and reestablish strong communication[s]" with J.A.G. CP at 79. It was undisputed that J.A.G. has had no more than two face-to-face contacts with her father in nine years. And, Machnik testified that counseling and reunification services would be necessary to rebuild the relationship between D.G. and J.A.G. Therefore, substantial

10

evidence supports the juvenile court's finding that visitation and counseling would be necessary for reunification.

D.G. does not assign error to any other findings of fact. Accordingly, the remaining findings of fact are verities on appeal. *P.D.*, 58 Wn. App. at 30.

### III. Statutory Basis for Dependency

D.G. also argues that the Department failed to establish a statutory basis for the dependency. Specifically, D.G. argues that the Department failed to prove that there was a danger of substantial damage to J.A.G.'s psychological or physical development. Based on the lenient standard for establishing a dependency, the Department met its burden to prove that J.A.G. was a dependent child.

To meet its burden to establish a statutory basis for the dependency, the Department must only show a mere danger of harm. *Schermer*, 161 Wn.2d at 951. Here, J.A.G. testified that she was "very scared" at the thought of moving to Montana to live with her father. RP at 78. Bingham and Machnik both testified that it would be damaging to J.A.G. to force her to move away from her mother, her friends, and her school to live with a parent she did not know. And, Machnik testified that J.A.G. was already struggling with dealing with being removed from her mother's care because she was very close with her mother. The Department did not need to prove that substantial harm would occur or what that specific harm would be. The Department merely needed to prove, by a preponderance of the evidence, that a danger of substantial harm existed. Based on the evidence presented at the contested hearing, the Department met its burden to prove placing J.A.G. with her father posed a *danger* of substantial harm.

Here, all the parties, including D.G., agree that D.G. has been absent from J.A.G.'s life since she was five and that a lot of work needs to be done for D.G. and J.A.G. to reestablish a

11

relationship. As Machnik testified, this is the purpose of establishing a dependency–so that D.G. and J.A.G. can obtain the services necessary to allow D.G. to parent J.A.G. Here, the Department met its burden to show that being placed into D.G.'s care and forced to move to Montana posed a danger of substantial harm to J.A.G.'s psychological development. And the Department met its burden to show that services were necessary to help reunify D.G. and J.A.G. Therefore, the Department met its burden to establish a statutory basis for the dependency under RCW 13.34.030(6)(c).

The juvenile court did not err by concluding that J.A.G. had no parent capable of adequately caring for her, such that she is in circumstances which constitute a danger of substantial damage to her psychological or physical development. Accordingly, we affirm the juvenile court's dependency order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

MAXA, A.C.J.

WORSWICK, J.