IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br><br>K.V.,<br><br>Minor Child.<br><br>S.T.-V., mother,<br><br>Appellant,<br><br>v.<br><br>DEPARTMENT OF CHILDREN,<br>YOUTH, and FAMILY SERVICES,<br><br>Respondent. | No. 86153-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — S.T.-V.[1] appeals the trial court's determination that her son, K.V., is a dependent child under RCW 13.34.030(6)(c), and his removal from her care under RCW 13.34.130(6)(c). We hold that substantial evidence supports the trial court's dependency determination and disposition order. Accordingly, we affirm.

FACTS

S.T.-V. is a single mother and the primary caregiver of K.V.[2] In July 2022 the Department of Children, Youth, and Families (Department) responded to a report of

---

[1] We use initials consistent with the mother's own request in the record to be referred to with a hyphenated surname.

[2] Prior to the dependency hearing at issue, a default dependency order had been entered as to K.V.'s father.

loud screaming from the mother's apartment in Kirkland.[3] After multiple unsuccessful attempts to contact the mother, the Department filed a dependency petition and pick-up request in August. At the time K.V. was almost four years old.

After temporarily removing K.V. from the mother's care, the trial court entered an agreed shelter care order on August 12 and placed K.V. with his mother. The mother agreed to, among other conditions, engage in mental health services and, with the Department's assistance, enroll K.V. in daycare, have him assessed for possible speech delays, and participate in an in-home evidenced-based parenting support service. Child Protective Services (CPS) investigator Ashley Whipple testified the Department's main safety concern was the mother's potentially untreated mental health and the impact of her behaviors on K.V.[4]

Whipple testified the mother jumped from topic to topic and her communication was "really hard to follow." Whipple testified the mother seemed to mistrust the Department "as a whole." Initially, the mother was enrolled with a mental health therapist, but the Department was not able to confirm the level of her engagement. Assigned to K.V.'s case starting September 2022, Department social worker Kathleen Walter testified the mother did not acknowledge she had mental health conditions other than post-traumatic stress disorder (PTSD) related to her past experience with domestic violence. Walter, who had professional experience and training in mental health, believed the mother to be experiencing "more mental health issues than just PTSD."

---

[3] The trial court heard testimony referencing the Department's prior involvement with the mother when K.V. was a baby, including K.V. being removed from the mother's care at that time.

[4] Whipple testified to the Department's concern being based on reports, not admitted for the truth of the matter, that neighbors heard the mother screaming and calling K.V. "retarded" and saying "she was going to end him."

Whipple and Walter testified to a distantness between the mother and K.V. during home visits. During Whipple's visit, K.V. "was just kind of roaming around the apartment doing what he wanted, and ... [the mother] was kind of struggling to parent him at the same time as having to" do other tasks. Whipple testified the mother and K.V. did not interact often and when they did "they went back to these separate kind of bubbles." Similarly, Walter testified K.V. spent most of the time playing on the phone and was usually alone in his bedroom. Walter described it as a lack of "togetherness," "a very separate kind of feeling," and "not a very close, intimate kind of relationship."

It is undisputed K.V. has delays in speech and with potty-training. Whipple and Walter testified to K.V. not speaking in full sentences. Walter testified to K.V. being "several years behind developmentally" and that generally children at his age are able to have a conversation with her. In addition to his speech delays, K.V. was not at the social level of even a two- or three-year-old. Before transferring K.V.'s case to Walter around late August and early September 2022, Whipple emailed the Lake Washington School District requesting a screening for preschool and special needs services through the district's individualized education plan (IEP), which could include speech therapy, occupational therapy, and other potentially necessary developmental supports. Starting in August 2022, the Department repeatedly sent the mother the paperwork required to start the IEP process. Walter testified the mother failed to fill out the paperwork any of the times the Department sent it to her.

Although the mother worked with a different provider, Sandbox, to assess K.V. for speech therapy around the end of 2022, she did not provide the assessment or any

visit documentation to the Department.[5] Walter also contacted Sandbox, but did not hear back from them. In February 2023 the Sandbox office shut down and alternatively offered virtual speech therapy, which the Department agreed was not appropriate for K.V.'s age. To Walter's knowledge, the mother did not look for replacement providers. At times the mother asked Walter if the Department would pay for swimming lessons or horse therapy to "cure [K.V.'s] … speech therapy," because K.V. "couldn't scream if he was swimming," and the mother had been a horse trainer and knew it would help K.V.'s speech. Despite Walter's own search efforts, she was unable to locate any in-home or community-based speech therapy providers. Walter explained that at K.V.'s age, speech therapy is provided "through the school district."

Since January 2023, Walter testified K.V. had not shown improvements in his speech the way a typical child should. K.V. had also not been enrolled in daycare or preschool[6] since January after being asked to leave two providers due to his behaviors. One provider discharged him in part due to his poor attendance. Walter testified the mother went days and sometimes weeks without bringing K.V. and was frequently late.

After Walter unsuccessfully tried to schedule an April visit with the mother, the Department filed a motion to compel visits and the mother's follow-through with services. In May the Department also filed a motion to remove K.V. from the mother's

---

[5] Walter testified she did not see the assessment until the guardian ad litem sent it to her. The guardian ad litem testified to being assigned to K.V.'s case on August 31, 2023. Walter testified she shared the assessment with the Lake Washington School District, but it was not as thorough as possible because the mother failed to complete paperwork the provider sent to her before the provider assessed K.V.

[6] As stated above, the trial court ordered the mother, among other conditions, to enroll K.V. in daycare. The record and parties' briefing seem to refer to daycare and preschool interchangeably, at least in terms of the mother's ability or willingness to establish services for K.V.'s needs. We refer to the settings consistent with the terminology used in the record.

care after Walter received a "rambly" and "tangential" voicemail from the mother reporting that K.V.'s father and her neighbors were threatening her. The trial court denied the Department's motion to remove, but granted the motion to compel services.

The court ordered the mother to immediately comply with services outlined in the August 12, 2022 shelter care order. At a home visit in May, the mother reported she was no longer engaged in mental health services. At a second visit in May, the mother informed Walter she was not going to engage in any services, including daycare or preschool, an IEP assessment for K.V.'s speech and developmental needs, in-home services, or mental health.[7] The mother said she should not be required to complete services because she is a domestic violence victim. Walter testified the mother again expressed her unwillingness to engage in services when Walter conducted visits in June and July. In June Walter completed and sent the IEP paperwork to the school district. Walter testified:

> So I think if I hadn't sent that paperwork in, that process still wouldn't have been started if we were waiting for her.
> ....
> I think … [the mother's] ability to focus and complete tasks has been impaired. I think that she is struggling to focus on things and – and that she cannot stay with something long enough to complete it and that that has been a challenge when it comes to working to complete a task, even the – when she got him the assessment at Sandbox, when I finally did see the assessment that was done, she hadn't sent the paperwork in that they requested her to fill out before the assessment, although they requested it multiple times.
> So she sometimes does not do a full job even when she does do a task, and when you're trying to get a service for a kid, the assessment and the providers are relying on as much information as they can get, and if a parent doesn't complete the forms that are sent to them, the assessment isn't near as reliable and informative as it could have been.

---

[7] CPS investigator Whipple testified she referred the mother to an in-home parenting therapy service to assist the mother with difficulties the mother expressed having with K.V.'s "outbursts" and in how to "positively parent him." Whipple said, after she made the referral to the provider, the mother emailed the provider once and "that was the extent of contact."

In July the mother reported to the Department she was having challenges finding a daycare. The mother rejected Department-offered options because she believed the providers were "conspiring with DCYF, and that they're somehow working with the Department against her." Walter testified the mother reacted the same way when Walter referred her for an educational advocate to support the IEP process or when Walter offered speech provider referrals: "[S]he didn't want my help offering service providers. In her mind, she would tell me that they were conspiring with the Department against her." The mother accused the IEP support worker of working with the Department to kidnap K.V. and made personal and racial statements about the worker.

Also in summer 2023, Lake Washington School District learning director Kimberly Brenner contacted the mother multiple times to schedule an IEP screening appointment. Brenner was forwarded the mother's contact information after the mother refused to work with the district's IEP assessment coordinator. The mother cancelled the scheduled screening. Brenner testified at that point the IEP team decided to bypass the screening and move forward with a special education evaluation based on information they had about K.V.'s needs and the fact that he was going to be kindergarten eligible in fall 2023. Brenner explained, "[W]e had an interest to continue the process moving forward and not lose any more time, and "[e]arly intervention is where we see the most gain, so the sooner we can get kids services, the better." Brenner testified to the importance of addressing K.V.'s needs before kindergarten:

> Especially in the areas of social-emotional and adaptive, it's all kind of around regulation, self-regulation, and being able to navigate their world with a level of independence as developmentally appropriate. So not receiving those services would make when they enter the elementary world at kindergarten very challenging because there's a level of independence that is required of students.

The mother then limited her consent to a speech evaluation, rather than agreeing to a comprehensive needs evaluation with a psychologist. Brenner scheduled K.V. for a speech-only assessment, but the mother and K.V. did not show for the appointment. The mother emailed Brenner stating she had legal obligations, expressed she was upset with Brenner, and asked to have Brenner's supervisor's contact information. The mother also sent emails to Brenner's supervisor, accusing her of libel, defamation, and child endangerment.

At a home visit in July, Department social worker Walter testified the mother was "extremely agitated" and called Walter vulgar names. The mother also called K.V. "a little shit" and "retard." When K.V. used his diaper, the mother told him "she would clean up his shit, but she was not going to put up with his shit anymore because things were going to change; ... she was done being a people pleaser." Walter testified K.V. "froze" while his mother yelled at him and "stood there shaking." Walter described the mother's emotional cycles and anger as "stunning." Walter testified the mother "went from screaming and ranting at me, and then she would apologize and calm down, and then she became extremely escalated again, and the whole time I was there, she cycled back and forth from one extreme to the other." At the same visit, the mother changed K.V. and asked Walter, "Do you want to see his penis, because that's what white people like to do?" Walter ended the appointment early due to the mother's inappropriate behavior.

In August Walter was unable to complete a home visit because the mother reported she was on vacation. The mother told Walter to "stop harassing her." The Department again filed a motion to remove and compel services. The court granted the

Department's motion to remove on September 15 and K.V. was temporarily removed from the mother's care and placed in licensed foster care after staying with the mother's friend for a few days who was not able to continue caring for him because of his high needs.

While in the Department's custody, Walter took K.V. in for the IEP assessment. A psychologist, occupational therapist, and speech pathologist assessed K.V. During the evaluation, the school psychologist testified K.V. was unable to speak in complete sentences or ask for help, including communicating he needed to have a bowel movement. K.V. was assessed as being developmentally delayed, with delays in the areas of social-emotional and adaptive.[8] The psychologist characterized K.V.'s language, receptive skills, and expressive communication scores as "significantly below average." As a result of the evaluation, K.V. automatically qualified for speech therapy, occupational therapy, and specialized instruction in adaptive self-help and social-emotional skills.

After the assessment was completed, the mother signed the IEP, allowing K.V. to begin enrollment at the end of October 2023 for preschool, speech therapy, and other services. Walter testified if the mother had previously completed the IEP paperwork and taken K.V. in for the assessment, K.V. "could have been enrolled in preschool all of last year and ... been getting speech therapy and all the other developmental services for an entire year already because he would have qualified for the school district." Walter

---

[8] Similarly, K.V. scored 49 on an assessment of his fine motor skills; more than a 2.0 standard deviation delay. The psychologist testified to K.V. scoring at about a negative 3.0 standard deviation delay in his adaptive skills and between 2.0 and 2.8 standard deviation delay for social-emotional development.

testified the mother's "biggest [parenting] deficiency" was her "unmet mental health needs and how those unmet needs are impacting her child."

After K.V.'s temporary removal from the mother in September 2023, guardian ad litem Joan Freeman attended two family team decision meetings where Freemen testified the mother required redirection and spoke throughout the majority of the meetings with pressured and tangential speech. One of the meetings ended early because the mother became very upset. Freeman testified:

> She was consistent in both meetings that what he needed was her, and that she knew him best. She stated in one meeting that he needed a guitar and a keyboard for his mental health. She ... did not really address his needs. I believe at one, she denied that he wasn't toilet trained or stated that he was using the toilet with her.

The mother did not indicate a willingness to set up a meeting for Freeman to see K.V. and sent Freeman 23 emails in one day that included language about the court abusing K.V. and stating the mother knew him best and was going to sue everyone in the case. Freeman described K.V. as having extreme needs and as being "severely behind." "[W]ithout services, it's unlikely that [K.V.] ... will be able to engage in any sort of regular educational process." Freeman testified the mother does not understand what K.V.'s needs are and characterized the mother's behaviors as barriers to K.V. accessing services. "She's very fearful of any sort of intervention, and ... [that] is unfortunately the only way" that K.V. "is going to be able to get those services."

The week before K.V.'s dependency hearing in October 2023, Department social worker Walter completed another home visit, which maintained her concerns about the mother's mental health status and her erratic behavior. Walter testified:

> She appears to be more hostile and aggressive, more paranoid about what is going on around her. She reports that all of her neighbors are

9

against her; that the Department is against her; that ... people are trying to take [K.V.] ... and traffic him. She just isn't currently able to understand that her mental health is impacting her ability to meet his needs.

Walter expressed concern about the impact of the mother's erratic behavior on K.V., especially due to K.V.'s inability to verbalize how his mother's behavior is impacting him. Walter stated although the mother clearly loves K.V., "her mental health is impacting her ability to meet his exceptional needs at this time," and K.V. should not have to keep missing opportunities to catch up on services because the mother refuses to address her own mental health needs. Walter testified K.V.'s health, safety, and welfare would be jeopardized if he were to remain in the mother's care.

Before K.V.'s dependency hearing in October 2023, the mother was arrested for violating a protective order protecting her neighbor and the Kirkland police department resultantly placed K.V. in protective custody. The arresting officer Patrick Chantharangsy observed the mother having an "unusual rollercoaster of emotions" "in a very short, rapid amount of time." The officer described at one point the mother became very angry at the officer "like a switch that came on" and then "seemed really happy" when a different officer came over to speak with her. When K.V. was taken into protective custody, the officer did not recall K.V. being upset that he had to leave his mother, and K.V. did not appear to be upset when the officer later observed him at the police station.

The mother did not attend the dependency hearing, which was held over the course of four days. At the hearing, when asked if the mother has ever acknowledged K.V.'s developmental needs, Walter testified the mother only recently admitted that K.V.

has developmental delays and "[f]or a long time, she only acknowledged that he needed speech therapy."

On November 7, 2023 the court delivered its oral order finding K.V. dependent under RCW 13.34.030(6)(c). Pending the disposition hearing, K.V. remained in the mother's care.

At the disposition hearing on December 8, 2023, the mother testified she would "do the health and safety visits every day if that's what it takes to keep" K.V. in her home. During her testimony, the mother testified she would work with the Department, but seemed to suggest she would not work with Department social worker Walter because the mother believed Walter had been in touch with people who abused her and "they do have a deal to try to trade my child for a green card." When asked if she has been diagnosed with a mental health issue, the mother testified that, in addition to a PTSD diagnosis, she at one time received a "fake" diagnosis of bipolar disorder and was forced to accept the diagnosis.[9] The mother testified she was willing to engage in therapy and was on a waitlist for a counselor but that she would need child care.

When asked about K.V.'s recent preschool attendance, the mother confirmed K.V. did not attend preschool for multiple days. The mother asserted that K.V. was potty-trained but "[h]e just won't go No. 2 all the time." The mother seemingly agreed with the State's rebuttal argument that there had been more than 30 contacts between

---

[9] Medical records submitted to the court as part of the Department's disposition motion indicate a history of involuntary hospitalization and diagnoses of bipolar disorder with manic episodes, "likely" borderline personality disorder, anxiety, and PTSD. At the start of the disposition hearing, the trial court acknowledged reviewing the Department's report, CASA's reports, and the mother's memorandum for disposition.

the mother and law enforcement since the dependency hearing. The mother interjected: "Yes, I'm working for the detective."

The mother interrupted the proceeding several other times, including calling the State's attorney "a bully" and saying guardian ad litem Freeman was "in contempt of court." In her closing, the mother's attorney acknowledged the mother has "a great need for mental health counseling." But the mother interrupted the trial court's oral ruling to state that her emotional challenges were related to domestic violence, not mental health. At the end of the disposition hearing on December 8, 2023, the court ordered K.V. removed from the mother's care under RCW 13.34.130(6)(c) and placed in licensed foster care.

The mother appeals.

## DISCUSSION

### Dependency

The mother argues there was insufficient evidence to support the court's finding that K.V. is a dependent child under RCW 13.34.030(6)(c). We disagree.

A dependency order is reviewed "to determine whether substantial evidence supports the juvenile court's findings of fact and the findings support the conclusions of law." In re Welfare of X.T., 174 Wn. App. 733, 737, 300 P.3d 824 (2013). "'Substantial evidence exists if, when viewing the evidence in the light most favorable to the prevailing party, a rational trier of fact could find the fact more likely than not to be true,' or, in short, by a preponderance of the evidence." In re Dependency of A.C., 1 Wn.3d 186, 193-94, 525 P.3d 177 (2023).

"Parents have a fundamental liberty interest in the care and welfare of their minor children." In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007); see U.S. Const. amends. V, XIV; Wash. Const. art. I, § 3; Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). However, "[i]t is well established that when a child's physical or mental health is seriously jeopardized by parental deficiencies, 'the State has a parens patriae right and responsibility to intervene to protect the child.'" Schermer, 161 Wn.2d at 941-42 (quoting In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)).

Our state legislature states when a child's rights to "basic nurture, physical and mental health, and safety" are in conflict with a parent's rights, the child's rights and safety prevail. RCW 13.34.020. The goal of a dependency proceeding is to determine what is necessary for the child's wellbeing and best interests. In re Welfare of Becker, 87 Wn.2d 470, 476, 553 P.2d 1339 (1976). RCW 13.34.030(6) provides in part that a "dependent child" is one who

> (c) Has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

A dependency finding is proper under RCW 13.34.030(6)(c) where sufficient evidence shows that a child has special needs that could result in significant psychological damage if they remain unaddressed and a parent demonstrates an inability or unwillingness to address the child's needs. See In re Dependency of C.M., 118 Wn. App. 643, 650-51, 654, 78 P.3d 191 (2003) (discussing application of former version of RCW 13.34.030(6)(c) previously codified under RCW 13.34.030(5)(c)). The mother specifically contends that because a parent's anger or mental illness alone does

13

not render a parent unable to care for their child, there was not substantial evidence to support the trial court's finding that K.V. was dependent under RCW 13.34.030(6)(c).

It is true that a parent's mental illness or anger alone does not make a parent incapable of meeting their child's needs. In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005); In re Dependency of Q.S., 22 Wn. App. 2d 586, 611, 515 P.3d 978 (2022). However, the trial court's order in the instant case was not merely based on the mother's mental health status or her behaviors. Rather, under Finding of Fact 2.2.10, the trial court found the mother's likely mental health issues and poor judgment, including her challenges with interacting with service providers, affected her ability to address K.V.'s significant development delays. The court found that K.V. is likely to suffer irreparable psychological damage if his developmental needs are not timely met, and emphasized K.V.'s vulnerability based on his inability to express himself.

The mother asks us to analogize the present case to the facts in Q.S., 22 Wn. App. 2d at 586, wherein the court held the trial court's conclusions that the father's angry and resistant behavior toward the Department put his two children in danger of developmental damage under RCW 13.34.030(6)(c) were speculative. Id. at 610-11. However, unlike the instant case, the trial court in Q.S. did not specifically find the father was unable to meet one of his son's special needs. Id. at 610, 612. The trial court also did not hear testimony that the father otherwise thwarted his children's development or failed to address his son's special needs. Id. at 615.

The case before us is instead analogous to C.M., 118 Wn. App. at 643. In C.M., the trial court heard testimony about a three-year-old child's language developmental

delays and that the father's cognitive challenges interfered with his ability to provide sufficient stimulation for the child and to implement a recommended parenting technique. Id. at 651-53. This court affirmed the dependency order, holding that although the record showed the father loved his child and could adequately meet his son's basic needs there was substantial evidence that the father's mental illness and poor judgment affected his ability to attend to his son's delays, thus putting the child at risk of significant psychological damage. Id. at 654.

In the present case, the trial court acknowledged the mother was meeting K.V.'s basic needs but found the mother showed a pattern of emotional dysregulation and inability to manage herself when she had frustrations. In its oral order, the trial court explained that a parent must be able to successfully interact with service providers to meet a child's special needs.[10]

It is undisputed K.V. has delays in speech and with potty-training, and the trial court heard multiple witnesses testify to K.V.'s significant developmental delays and the time-sensitive importance of K.V.'s engagement in special needs services so he did not fall further behind. The trial court also heard extensive testimony from Department social worker Walter, assigned to K.V.'s case for more than a year, supporting her assertion that had she not completed the IEP paperwork and taken K.V. in for an assessment he would not have been enrolled in special needs services.

---

[10] Notably, the trial court stated it did not make a finding on K.V.'s level of attachment with the mother, but that "the nature of their interaction has some bearing on my finding that, at least right now, without some additional help, the mother is not able to meet ... [K.V.'s] special needs." Indeed, both Department social worker Walter and CPS investigator Whipple testified to their individual observations of a separateness and lack of "togetherness" between K.V. and his mother. The trial court also heard testimony from Officer Chantharangsy that K.V. was not upset after he was removed from his mother's care and put in protective custody.

According to Walter's testimony, the mother failed to provide K.V.'s initial speech therapy assessment to the Department and to establish K.V. with a new provider, instead asking for funding for swimming lessons or horse therapy to "cure" K.V.'s speech needs. Additionally, the mother failed to complete the required IEP paperwork despite the Department sending it to her multiple times, and repeatedly expressed her unwillingness to engage in services. Even when K.V. was enrolled in daycare or preschool in 2022, the mother often did not take him or was late, contributing to his discharge. The court also heard testimony from the school district that the mother failed to follow through with IEP appointments and refused to work with staff.

Additionally, several witnesses testified to experiencing the mother's erratic behavior and emotional dysregulation. Walter testified to her professional mental health experience and her belief the mother was experiencing mental health issues beyond PTSD. The court heard various examples of the mother's concerning behavior, including toward K.V., service providers, the Department, and law enforcement. Particularly concerning to this court was Walter's testimony about a disturbing home visit in July 2023, when the mother called Walter and K.V. profane names and asked Walter if she wanted to see K.V.'s penis "because that's what white people like to do."

The trial court heard both Walter and CPS investigator Whipple testify to the mother's mistrust of the Department. Walter testified to the mother not pursuing daycare options or following up on speech referrals because the mother believed the providers were conspiring with the Department against her. Walter and guardian ad litem Freeman testified to their concern that until the mother addressed her mental health needs or behaviors, she was unable to meet K.V.'s special needs. Substantial evidence

before the trial court thus demonstrated that because of the mother's failure to work successfully with the Department and school district, K.V. lost a year of potential and critical developmental progress.

Furthermore, after K.V.'s IEP assessment, the trial court heard testimony that the mother did not effectively participate in meetings regarding K.V.'s needs and progress, including causing a meeting to end early because she became upset. At the meetings, the mother failed to demonstrate insight into K.V.'s needs and insisted she knew him best. Walter testified K.V.'s welfare was in jeopardy if he remained in the mother's care, and expressed concern about K.V.'s inability to explain how his mother's behavior was affecting him.

We conclude substantial evidence supports the trial court's finding under RCW 13.34.030(6)(c) that the mother's emotional dysregulation and behaviors interfered with her ability to connect K.V. with special needs services critical for his development. Accordingly, we affirm the dependency order.

## Disposition

The trial court ordered at disposition for K.V. to be placed into the Department's care under RCW 13.34.130(6)(c), which permits out-of-home placement if the State demonstrates by clear, cogent, and convincing evidence that "a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." The mother contends the trial court erroneously removed K.V. from his mother's care because a parent's failure to address their child's special needs does not constitute

abuse under RCW 13.34.130(6)(c). We disagree and affirm the trial court's disposition order.[11]

A court's placement decision at disposition is reviewed for abuse of discretion. In re Dependency of R.W., 143 Wn. App. 219, 223, 177 P.3d 186 (2008). The standard is "extremely deferential." Hoffman v. Kittitas County, 4 Wn. App. 2d 489, 495, 422 P.3d 466 (2018), aff'd, 194 Wn.2d 217, 449 P.3d 277 (2019). Abuse of discretion occurs only where a court's decision is "manifestly unreasonable," relies on facts unsupported by the record, or is based on a misinterpretation or misapplication of the law. In re Matter of Guardianship of L.C., 28 Wn. App. 2d 766, 772, 538 P.3d 309 (2023).

The child's best interests are the court's central concern in a placement determination. R.W., 143 Wn. App. at 224 (citing RCW 13.34.020). The definitions under the disposition statute RCW 13.34.030 apply to the chapter that the statute sits within "unless the context clearly requires otherwise." Under the chapter, "abuse or neglect" is defined as "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, ... or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1); see RCW 13.34.030(6)(b). "Negligent treatment or maltreatment" is "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW

---

[11] Much of the mother's briefing focuses on what constitutes an "available" parent under RCW 13.34.130(6)(a). Because the trial court's removal order is based exclusively on RCW 13.34.130(6)(c), we do not address the mother's argument regarding RCW 13.34.130(6)(a). "The court must address only those claims and issues necessary to properly resolving the case as raised on appeal by interested parties." Clark County v. W. Wash. Growth Mgmt. Hr'gs Rev. Bd., 177 Wn.2d 136, 145, 298 P.3d 704 (2013).

26.44.020(19) (emphasis added); see In re Dependency of Lee, 200 Wn. App. 414, 434-35, 404 P.3d 575 (2017).

This court in In re Dependency of E.L.F. held there was substantial evidence that a "mother's denials, inconsistency, and active hostility" thwarted service providers' attempts to assist her son who had significant development delays, including in language development. 117 Wn. App. 241, 248, 250, 70 P.3d 163 (2003). This court held such conduct "was a form of neglect that presented a clear and present danger to her son's health, welfare, and safety." Id. at 250 (emphasis added).

The mother, parallel with her dependency argument, contends that K.V.'s special needs and the mother's mental illness do not alone establish a manifest danger of serious abuse or neglect. But, akin to the dependency hearing, the trial court's disposition order did not suggest that removal was based merely on the mother's mental illness or the existence of K.V.'s special needs. Rather, among other concerns related to the mother's behaviors, the court stated "the bottom line" is that K.V.'s "[special] needs will not be met if he remains in his mother's home." The court stated it had little doubt that if K.V. had not been removed and put in the Department's custody, "he would not be in services." The court acknowledged orders were "in place for a very long time" and based on the mother's failure to address those requirements, the court had "no faith" the mother would follow the orders if K.V. were returned to her care.

The mother argues the evidence showed she made strides to meet K.V.'s special needs, such as enrolling him in daycare and speech therapy, and that her behaviors did not pose a risk to K.V. "The State does not remove children born with special needs from parents until the parents have the opportunity, but fail, to learn to meet the needs."

In re Welfare of Ca.R., 191 Wn. App. 601, 629, 365 P.3d 186 (2015). Here, the mother had a year's time to demonstrate her ability to meet K.V.'s special needs by engaging with the school district's host of services. As explained above, the record shows because of the mother's inability to follow through or her otherwise active resistance, K.V. lost a year of critical developmental support.

Additionally, the mother's own testimony at disposition supported the trial court's concern. The mother testified K.V. recently did not attend preschool for multiple days and denied K.V. was not potty-trained. Although the mother testified she would "do the health and safety visits every day if that's what it takes to keep" K.V. in her home, she continued to exhibit hostility toward the Department during the disposition hearing. Although her attorney conceded to her need for mental health services at closing, the mother continued to demonstrate a lack of insight into her mental health during the disposition hearing. Instead, the mother testified she believed her emotional challenges were only related to domestic violence and referred to her past bipolar disorder diagnosis as "fake."

Lastly, the mother argues it was insufficient for the trial court to merely state it considered the harm of K.V.'s removal from the mother's home without explaining such considerations on the record. The mother relies on In re Dependency of L.C.S., 200 Wn.2d 91, 514 P.3d 644 (2022), wherein our state supreme court held "[i]t is important that courts consider not only the potential harm of remaining at home but also the trauma and harm that may come from removal." 200 Wn.2d at 106. However, the L.C.S. court's statements were set forth in the context of shelter care hearings and the reasonable efforts statute, RCW 13.34.065(5)(a). Id. at 108. More particularly, the

L.C.S. court held because of the harm and "serious long-term trauma that removal may cause, the Department is required to make reasonable efforts" to prevent such removal, and such reasonable efforts must be put on the record. Id.; see RCW 13.34.130(6). Because she does not challenge whether the Department made reasonable efforts, the mother's reliance on L.C.S. is misplaced.

Sufficient evidence supported the trial court's finding that the mother's neglect of KV's special needs put his welfare in clear and present danger to satisfy removal under RCW 13.34.130(6)(c).

## CONCLUSION

We affirm.

_____
Coburn, J.

WE CONCUR:

_____          _____
Birk, J.                                        Brennan, J

21