# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Dependency of:<br><br>C.S.J.,<br><br>          A Minor Child | No. 48607-5-II<br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — M.L. appeals the juvenile court's order finding that her son, C.S.J., was a dependent child. M.L. argues that insufficient evidence supports the dependency. We conclude that sufficient evidence supports the juvenile court's finding of dependency. We affirm.

## FACTS

M.L. is the mother of C.S.J., born in February 2014. In July 2015, M.L. and C.S.J. lived in the home of C.S.J.'s paternal grandfather and his family. On the night of July 16, M.L. consumed alcohol in the home with C.S.J.'s paternal aunt, in violation of the "house rules." 3 Report of Proceedings (RP) at 294. As a result, M.L. was asked to move out of the home that night. Around 11:00 p.m., M.L. contacted law enforcement for assistance in finding a place for her and C.S.J. to spend the night.

Officer Steven Argyle arrived around 11:13 p.m. and spoke with the paternal grandfather and his family members. They told Argyle that they were recovering addicts who had been sober for years. They allowed M.L. to stay in their home with the agreement there would be no drinking or drugs. When Argyle first made contact with M.L., M.L. was upset.

Argyle told M.L. to pack an overnight bag for her and C.S.J. while he tried to make accommodation arrangements. M.L. appeared confused during the packing process and had to be given suggestions of what to pack. Argyle described M.L.'s behavior as "unusual" and stated he had a hard time communicating with her and he had to repeat himself several times. 2 RP at 217.

M.L. agreed to stay at the YWCA shelter and Argyle called its intake person to make arrangements. M.L. had to be screened before she could be given permission to stay. Before giving M.L. the phone, Argyle told her she needed to be calm and answer the intake person's questions. After speaking with M.L., the YWCA screener advised Argyle that M.L. was too emotional and could not stay at the YWCA.

The paternal grandfather then offered to pay for M.L. to stay at a hotel, and M.L. agreed. Argyle transported M.L. to the hotel, while C.S.J. was transported by his paternal aunt. M.L. was informed of the transportation arrangements, yet on the way to the hotel she screamed, "Don't take my child away from me." 2 RP at 221.

After arriving at the hotel, Argyle informed M.L. she would need to calm down before checking in. At the check-in counter, M.L. started yelling and a hotel employee informed M.L. that she could not stay at the hotel. Argyle requested assistance and Deputy Benjamin Herrin arrived. Herrin observed M.L. to be argumentative. She called the officers names and demanded that they do something.

The officers attempted to contact multiple friends and family members for assistance on behalf of M.L., but they were unsuccessful. The paternal grandfather offered to take C.S.J. for the night, but M.L. refused. Argyle stated that M.L. indicated that she was going to take C.S.J. and walk the streets. Argyle would not let her do that. M.L. was informed that if they could not find a place for C.S.J. to stay, Child Protective Services (CPS) would have to be called. As a result of

48607-5-II

M.L.'s conduct and her indication that she would walk the streets with C.S.J., the officers placed C.S.J. into protective custody and took M.L. to a hospital for a mental health evaluation.

M.L. was involuntarily detained in Argyle's patrol car for transport to the hospital. During the transport, M.L. used profanity towards Argyle and made threats. The hospital administered a breathalyzer test. M.L.'s blood alcohol level at the time was .078.[1] The hospital then discharged M.L., but because she had nowhere to go and refused to leave, the hospital contacted law enforcement for assistance.

Officer Frank Robert Shaw responded to the call and picked M.L. up from the hospital. M.L. informed Shaw that she needed to get in contact with CPS, however, the CPS office was closed at that time. Shaw transported M.L. to the Bremerton ferry terminal and contacted a friend on her behalf who stated that he would get someone to pick her up. Shaw told M.L. that if nobody contacted her within a reasonable time to call 911 and ask for assistance getting to CPS. Shaw also informed M.L. that she had been trespassed from the paternal grandfather's home. Shaw observed M.L. to be well behaved.

M.L. subsequently called 911 and Shaw picked her up from the ferry terminal. Shaw first transported M.L. to the YWCA, but it was closed. He then transported her to a Department of Social and Health Services (DSHS) office, but it was also closed. Shaw waited with M.L. until a DSHS employee arrived and helped her.

After making contact with DSHS, M.L. did everything that was asked of her in order to have C.S.J. returned to her care. She participated in the initial family team decision making meeting and provided two possible homes where she could reside with C.S.J., she provided a urine sample which was negative for controlled substances, and she provided proof of mental health

---

[1] M.L. claimed it was .02.

3

treatment and signed releases of information so DSHS could have contact with her mental health providers.

On July 21, 2015, despite M.L.'s efforts, DSHS filed a dependency petition as to C.S.J. DSHS initially planned to return C.S.J. to M.L.'s care and offer in-home services, however, it determined M.L. did not have a home to which C.S.J. could be returned. DSHS did not offer services to M.L. before filing the dependency petition.

C.S.J. was 17 months old at the time CPS took him into custody. Prior to the July 2015 incident, no concerns were reported to CPS regarding M.L.'s care of C.S.J. At the time CPS removed C.S.J. from M.L.'s care, he was a healthy child, there was no indication of abuse or neglect, and he was appropriately bonded to M.L. Prior to C.S.J.'s birth, M.L. obtained prenatal care, and after his birth, M.L. took C.S.J. to all of his doctor appointments and obtained all of his required vaccinations. Prior to DSHS's involvement, M.L. sought, and was voluntarily engaged in, mental health treatment. While she was living with the paternal grandfather, M.L. obtained employment and arranged daycare for C.S.J.

Following the filing of the petition, M.L. consistently participated in visitation, missing only one visit. M.L. was only provided one two hour visit per week at DSHS because of DSHS's financial issues. C.S.J.'s placement, the paternal grandfather's family, initially expressed a willingness to supervise visits, but subsequently declined any contact with M.L. During visits, supervisors observed that M.L. played with C.S.J., she changed his diapers, brought him appropriate snacks and food, greeted C.S.J. appropriately, made sure he was appropriately clothed, and did a good job of bonding with him. The visit supervisor did not observe any concerning or out of the ordinary interactions between M.L. and C.S.J., or any other staff members.

M.L.'s visits with C.S.J. before the dependency fact finding hearing were positive, with the exception of one. During one of M.L.'s initial visits supervised by DSHS, M.L. wanted to take C.S.J. outside and the supervising social worker, Kelly Linscott, asked M.L. if she had brought any sunscreen for C.S.J. M.L. responded that she did not feel he needed any, and Linscott disagreed. M.L. then stated that she thought C.S.J. smelled like he already had sunscreen on, and she wanted to take C.S.J. outside. They all proceeded outside, and M.L. and C.S.J. continued to play; nothing concerning happened. Another social worker came outside and also made a comment about C.S.J. being in the sun.

Linscott again expressed her concern, and suggested that M.L. move C.S.J. to the shade. M.L. then made a comment to C.S.J. about everybody being concerned about him being in the sun and that he would have to play in the shade. M.L. picked C.S.J. up and "plunked him down into the shade, in a not very gentle manner." 1 RP at 74. M.L.'s reaction to the suggestion caused the supervising social workers concern, and they reported that the rest of the visit was chaotic. C.S.J. began to cry in response to M.L.'s actions, but did not suffer any harm. Linscott did not file an intake.

After a hearing on the matter, the court ordered continued shelter care for C.S.J. until the fact finding hearing for the dependency petition.

In October 2015, M.L. missed a visit because she arrived fifteen minutes later than the scheduled visit time.[2] When M.L. arrived, she was informed that the visit supervisor had already left with C.S.J. M.L. became agitated and distraught because she would not be able to see C.S.J. As she left the visitation building, she "slammed the door really hard, [and] the whole building

---

[2] At that time, M.L.'s visits were supervised by an outside agency, and the visit would be terminated if a parent did not arrive with 15 minutes of the scheduled time.

shook." 1 RP at 34. A couple of children were upset by M.L.'s conduct. As a result of M.L.'s conduct, visits were moved back to DSHS.

DSHS also reported an interaction between M.L. and Linscott following a court hearing. M.L. became angry and started yelling at Linscott, accusing her of wanting to "steal" C.S.J. 1 RP at 75. Linscott described the outburst as unexpected; however, Linscott had just informed M.L. that she could no longer have phone contact with C.S.J. because the paternal grandfather and his wife would no longer allow it. Linscott tried to calm M.L. down, but she continued to escalate. Linscott stepped away from M.L. and allowed the assigned Guardian ad Litem (GAL) to take over the conversation. M.L. calmed down when she talked to the GAL.

In November 2015, the juvenile court held a fact finding hearing on the dependency petition. Argyle testified that C.S.J. seemed fine during the entire incident and he seemed happy. Argyle recalled that at one point M.L. asked to be able to hold C.S.J. and comfort him. Both Argyle and Herrin described M.L. as having very inconsistent behavior during the incident. Argyle additionally described M.L.'s behavior as "uncertain and unstable." 2 RP at 227. During his contact with her, Herrin stated that M.L. was "argumentative, defiant, enraged, [and] upset." 2 RP at 246. Based on M.L.'s behaviors and her choices, Argyle had concerns regarding C.S.J.'s safety and did not believe M.L. could take care of C.S.J. at that time. Argyle also did not believe having C.S.J. on the street for the night would be a healthy environment.

DSHS social worker Christie Dotson opined that M.L.'s mental health played a role in the dependency petition being filed. M.L. adequately and appropriately cared for C.S.J. on previous visitations, but Dotson believed that these actions did not mitigate the events of July 2015. M.L. seemed to have highs and lows in her behavior and emotions, she demonstrated ongoing erratic behavior and was very combative and difficult, and at other times agreeable and workable.

Based on M.L.'s behavior, DSHS had concerns that she had a substance abuse issue, but then it became concerned about her mental state. Dotson acknowledged that she had only observed M.L.'s behavior affect C.S.J. on one occasion. Dotson opined that because of M.L.'s mental health stability, the court could not craft an order with a safety plan that would adequately protect C.S.J.'s health, safety, and welfare, such that he could be immediately returned to M.L.'s care. M.L.'s housing situation did not appear stable. Dotson had concerns that returning C.S.J. to M.L. would present unsafe circumstances.

Dotson acknowledged that M.L. provided proof of mental health treatment and medication management and that she had signed releases of information to the social worker, but the providers did not return the social worker's calls. M.L. provided a urine analysis that was negative for all substances. M.L. was consistent in her participation in court hearings. Dotson opined that "in and of itself" expressing frustration with DSHS or sometimes willing to work with DSHS employees and sometimes not, was not a basis for a dependency. 2 RP at 186. Dotson went on to state that it was not M.L.'s difficult nature that was preventing C.S.J.'s return. Dotson said she "never had a concern that [M.L. was] not meeting [C.S.J.'s] basic physical needs." 2 RP at 150. She believed C.S.J. was a healthy boy who had a bond with his mother. Based on C.S.J.'s reactions to M.L., DSHS did not have concerns about neglect or abuse.

The GAL, Jessy Baker, also testified at the fact finding. She had concerns about M.L.'s mental health, in part based on M.L.'s decision during the July 2015 incident to walk the streets with C.S.J. Baker also testified about difficult interactions she had with M.L. Baker had concerns about M.L.'s mental health and stability, and she commented that M.L. was making animated motions during Baker's testimony. She also noted that at other hearings, M.L. had been very animated, had outbursts, and was argumentative with all of the parties involved. Prior to C.S.J.

returning to M.L.'s care, Baker stated that she would like M.L. to complete a mental health evaluation and a drug and alcohol evaluation. Baker opined that M.L. had not made any efforts to move the case forward so that C.S.J. could be returned to her care. Returning C.S.J. to M.L.'s care at that time would present both physical and psychological detriment to C.S.J.

M.L. also testified at the fact finding. She stated that she did not have a drug or alcohol problem. However, she acknowledged that her behavior towards the police officers during the July 2015 incident was inappropriate. She was defensive because she felt threatened, and that she was not thinking clearly, in part due to the alcohol, but also because of stress. M.L. opined that if C.S.J. had been left in her care that night, she would have been able to keep him safe. M.L. indicated that both her mother's home and a friend's home would have been available to her at the beginning of the case. At the hearing, M.L. said she currently held two jobs, obtained stable housing, and would be able to financially care for C.S.J. M.L. reported that she completed multiple urine analyses (UAs) for employment purposes. They were negative for alcohol and controlled substances. She was taking medications for her depression and anxiety because she had been having weekly panic attacks.

The juvenile court determined that C.S.J. was dependent pursuant to RCW 13.34.030(6)(c). In its oral ruling, the court stated in relevant part:

> [I]t's apparent to the court that [M.L.] does suffer from a mental health disorder. It's not in the record, but it should be noted as part of the record that there's some behaviors in court observed by myself.
>
> [M.L.]'s reaction, interactions in court, her physical reactions to things, were not consistent with a person who's exercising good judgment and has full control over her mental health issues.
>
> For example, during the testimony of Ms. Baker, who was describing her observations or what she understood of [M.L.], and [M.L.] made gestures with her arms that were just completely, in my observation, bizarre relating to the testimony. It made no sense. It certainly wasn't in the record, but it was an observation I made.
>
> My observations of [M.L.] are also consistent with the testimony of the witnesses, which lends credibility to the testimony of the witnesses, which is—I've

noticed [M.L.] be completely under control, be completely appropriate in court, and then suddenly sort of act inappropriately in the courtroom. Consistent with this incident from Ms. Baker's testimony, [M.L.] had previously testified and done quite a good job of maintaining control and being appropriate in the courtroom, and then, you know, a short time later, she's acting in a way that is not appropriate in the courtroom. [M.L.] knows she's in a courtroom.

I've chastised her a couple of times before the court case even started when we were having the domestic—or the dependency round-up. I had to chastise her for how she was vocalizing in court in a way that was interrupting or interfering with the court's ability to handle other matters that the court was attempting to address.

. . . .

The only interactions we've really had that involve the child and this unusual behavior are the incidents on July 16th and the incident with the social worker's supervision of visitation where we had the sun incident.

Under both circumstances, [M.L.], when dealing with some stress or confrontation, emotionally or mentally that affected her under some level of stress, I guess, [M.L.] made decisions that were counter to her child. [M.L.] on one occasion wanted to walk the streets in the middle of the night with an infant.

. . . .

The evidence that is before the court was that there was a hotel that was being offered to her. She had been brought to a hotel. It was not a question of payment, it was a question of her choice and her behavior. And she chose to put her child at risk rather than accept the opportunity of staying in a hotel for the night.
. .

And the second incident with the sun issue, [M.L.] demonstrated almost extremely juvenile behavior. . . She treated her child a bit aggressively. The child cried as a reaction to her conduct.

. . . .

And that was a minor incident under the supervision of the social worker where she demonstrated this behavior. So she's done these behaviors in front of police officers, in front of social workers, and it's concerning to the court about what might occur when there is not supervision around. . . . At this point in time, it appears to this court that [M.L.]'s mental health condition is right now interfering with her ability to properly and adequately care for her child in a way that it puts the child in circumstances which constitute a danger of substantial harm or damage to the child, either psychologically or physically.

. . . .

It's clear to me that she's well-bonded and I want to encourage that.

RP (12/3/15) at 4-10.

The juvenile court entered an order of dependency with findings of fact and conclusions of

law. The findings stated in relevant part:

2.2 . . . The following facts establishing dependency have been . . . proven by a preponderance of the evidence: Mother has a mental health problem that prevents her from safely parenting her child. Mother also has a need for a drug/alcohol evaluation secondary to her mental health concerns.

2.3 Statutory Basis: . . . The child is dependent according to RCW 13.34.030, in that the child: . . . (c) has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. . . .

2.4 . . . If the court schedules a separate disposition hearing, the child should remain in the placement and care authority of DSHS/Supervising Agency pending further order of the court. . . . It is currently contrary to the child's welfare to return home. The child should be placed or remain in the custody, control and care of DSHS/Supervising Agency for the following reasons: . . . there is no parent or guardian available to care for the child; and/or . . . the court finds by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger. . . . The child should be placed or remain in: . . . Relative placement with Paternal Grandfather.

CP at 126-27. The court found that DSHS made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home. M.L. appeals the order of dependency.

ANALYSIS

M.L. argues that insufficient evidence existed to support the court's finding of dependency. We disagree.

I.     LEGAL PRINCIPLES

Parents have a fundamental liberty interest in the care and welfare of their children. *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). The legislature has declared that "the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. But the State has "an interest in protecting the physical, mental, and emotional health of children," as well. *Schermer*, 161 Wn.2d at 941. A dependency is a preliminary proceeding that does not permanently deprive a parent of rights. *In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992), *cert. denied*, 507 U.S. 927 (1993). "Dependency proceedings are designed to protect children from harm, help parents alleviate the

problems that led to intervention, and reunite families." *In re Dependency of P.H.V.S.*, 186 Wn. App. 167, 181, 339 P.3d 225 (2014), *review denied*, 184 Wn.2d 1017 (2015).

In evaluating a claim of insufficiency of the evidence in a dependency proceeding, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. *In re Dependency of C.M.*, 118 Wn. App. 643, 649, 78 P.3d 191 (2003). Evidence is substantial if, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence. *In re Dependency of E.L.F.*, 117 Wn. App. 241, 245, 70 P.3d 163 (2003). The legislature has determined that in balancing the legal rights of parents against the rights of the child, the rights, health, and safety of the child "shall be the paramount concern." RCW 13.34.020; *Schermer*, 161 Wn.2d at 942. We do not weigh the evidence or make witness credibility determinations. *In re Welfare of C.B.*, 134 Wn. App. 942, 953, 143 P.3d 846 (2006). We treat unchallenged findings of fact as verities on appeal. *In re Interest of J.F.*, 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

To find a child dependent, the State must prove by a preponderance of the evidence that the child meets the statutory definition of dependency under RCW 13.34.030(6). *E.L.F.*, 117 Wn. App. at 245. Preponderance of the evidence means "more likely than not to be true." *In re Dependency of M.S.D.*, 144 Wn. App. 468, 478, 182 P.3d 978 (2008). RCW 13.34.030(6)(c) provides that a child is dependent if he or she "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." The dependency standard of proof is "relatively lenient" because a dependency serves the "important function of allowing state intervention in order to remedy family problems and provide needed services." *Schermer*, 161 Wn.2d at 942.

There are no specific factors the juvenile court must consider when determining whether a parent is capable of adequately parenting a child. *Schermer*, 161 Wn.2d at 952. Rather, the inquiry is highly fact specific. *Schermer*, 161 Wn.2d at 952. DSHS, however, need not prove that a parent is unfit before a dependency can be established. *Schermer*, 161 Wn.2d at 944. In *Schermer*, the Washington State Supreme Court stated:

> A dependency based on [former] RCW 13.34.030(5)(c) [(2003)] does not turn on parental "unfitness" in the usual sense. Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. Under [former] RCW 13.34.030(5)(c), it is unnecessary to find parental misconduct in order to find a child dependent.

161 Wn.2d at 944. Similarly, a dependency finding under RCW 13.34.030(6)(c) need not be based on "proof of actual harm," but instead can rely on a mere "danger of harm." *Schermer*, 161 Wn.2d at 951. The State does not need to "stay its hand until actual damage to the endangered child has resulted." *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979).

A juvenile court has broad discretion to determine when a risk of harm exists. *Schermer*, 161 Wn.2d at 951. In addition, it may consider a parent's history of parenting in deciding whether or not a child is dependent. *In re Dependency of Brown*, 149 Wn.2d 836, 841, 72 P.3d 757 (2003) (concluding there was substantial evidence to support dependency where parent had yet to show he could provide a stable home to child even though he was making efforts towards alleviating the problems that led to the child's removal from his care).

II.     SUFFICIENT EVIDENCE SUPPORTS THE DEPENDENCY FINDING

M.L. argues that insufficient evidence supported the court's finding C.S.J. dependent.[3] We assess whether substantial evidence supports the findings of fact. *C.M.*, 118 Wn. App. at 649.

The evidence demonstrated that M.L.'s mental health problem prevented her from safely parenting her child. Several episodes of behavior concerned the trial court and the professionals assigned to the case. Witnesses testified that they were considered about M.L.'s mental health issues, and M.L. testified that she sought mental health care. Mental illness is not by itself, proof that a parent is unable to safely parent his or her child. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005). However, when we consider all of the events in this case in light of the large amount of discretion granted to the juvenile court, the evidence does support the trial court's finding that M.L.'s mental health problem posed a risk of harm to C.S.J. sufficient to support the entry of dependency under the lenient preponderance standard.

Finding of fact 2.3 established the statutory basis for the dependency. The court found, "that the child: . . . has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." CP at 126. We conclude that substantial evidence supports this finding. We again emphasize that the record as a whole and all of the events support the finding there is a statutory basis for the dependency.

---

[3] In making this challenge, M.L. specifically asserts that insufficient evidence supports the trial court's findings of fact 2.2, 2.3, and 2.4. However, in making her argument she melds all of them into one argument, i.e., that the trial court erred in finding C.S.J. dependent because insufficient evidence existed to support the decision. For this reason we address M.L.'s broader argument and address the record's facts as a whole. We do note that our review of the record demonstrates sufficient evidence does support each of the challenged finding of facts.

In addition to the July 2015 incident, M.L. acted inappropriately with DSHS employees as outlined previously in this opinion. She expressed high levels of frustration at employees. She showed up late for a visitation. When viewing all of the evidence, it demonstrates that M.L. had an inability to have appropriate reactions to stressful scenarios which posed a risk of harm to C.S.J. Because of the juvenile court's ability to hear testimony of witnesses, observe M.L., and make its assessment with broad discretion, there is substantial evidence to support this finding.

The juvenile court found in finding of fact 2.4 that "there is no parent or guardian available to care for the child; and/or . . . the court finds by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home, and an order under RCW 26.44.063 will not protect the child from danger." CP at 127.

We conclude that substantial evidence supported this finding. DSHS concedes that there "must be a nexus between a parent's mental health conditions and a risk to the child's health, safety, or welfare." Br. of Resp't at 13. Again, the evidence demonstrates that M.L. had an inability to have appropriate reactions to stressful scenarios. Even though M.L. never actually harmed her child, all of these facts creates a nexus between her mental health and her ability to not put C.S.J. at risk of danger, particularly in a stressful situation.

Finally, these findings of fact support the trial court's conclusions of law.

Accordingly, we conclude that the juvenile court did not err because its finding of dependency is supported by substantial evidence in the record.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Johanson, J.

Bjorgen, C.J.