IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of M.S., <br><br><br> A minor child. | No. 80914-8-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

CHUN, J. — M.S.'s mother appeals an order of dependency. She contends that the Department of Children, Youth and Families (Department) failed to present sufficient evidence to support a finding of dependency. She also claims a due process violation, contending she did not receive notice of the allegations on which the trial court based its finding of dependency. We affirm.

BACKGROUND

M.S.'s mother is the mother of six children. M.S.'s father does not challenge the finding of dependency and is not a party to this appeal.

When the mother's oldest child, K.A.W., was a baby, the Department petitioned for a dependency order and removed him from her care. The court ultimately terminated the mother's parental rights to K.A.W., finding that she "engaged in no services to remedy her parental deficiencies."

The mother's next three children, K.R.T.W., S.R.P.W., and K.R.-K.W., were removed in December 2015 for "parenting issues, mental health concerns,

Citations and pin cites are based on the Westlaw online version of the cited material.

and lack of stable housing." The mother agreed that the children were dependent under RCW 13.34.030(6)(c) and that "she must address parenting issues, mental health concerns, and stable housing in order to safely parent."

During the dependency proceedings for these three children, the Department referred the mother for a psychological evaluation with a parenting component, parenting classes, parent coaching, mental health counseling, a drug and alcohol evaluation, and random urinalysis testing. In September 2017, psychologist Dr. Sierra Swing diagnosed her with post-traumatic stress disorder (PTSD) with dissociative symptoms, a personality disorder with mixed personality features, and borderline intellectual functioning. Dr. Swing recommended that the mother participate in trauma-informed counseling to "form insight into her own emotions and difficulties, and recognize the impact that her behavior has on others." But she was concerned about the mother's ability to make progress in counseling because she had "a tendency to blame things on others" and did not believe she needed help or improvement, which "impacts her willingness to learn something different or more effective." Dr. Swing also recommended the mother participate in vocational training.

The mother's compliance with services was poor. She was terminated from both her parenting classes and the parenting coaching because of chronic absences and lack of cooperation. The mother attended only a few counseling sessions before quitting. She did not complete the substance abuse evaluation or any urinalysis tests, and refused to participate in vocational training.

In February 2018, the trial court terminated the mother's parental rights to K.R.T.W., S.R.P.W., and K.R.-K.W. It found that, even if she "were to engage in services and achieve the best possible progress," it would take two years to reunify her with the children.

The mother later gave birth to her fifth child, B.S. M.S's father is also father to B.S. Hospital staff "reported concerns about the mother and father's behavior following the birth" and contacted the Department, which petitioned for a dependency order.

The Department referred the mother for urinalysis testing and made "considerable efforts" to schedule testing at times and locations convenient for her. She attended hardly any appointments. The Department also offered her individualized parenting instruction at her visits with B.S. She refused to participate unless she was given extra visits, which the court denied.

B.S.'s dependency trial took place in February 2019. The mother claimed that she was attending mental health counseling, as recommended by Dr. Swing. But she never informed the Department of this fact or signed a release of information, and there was no evidence presented at trial about her participation or progress. The court found there was no reason to believe that the counseling "has had an impact on her previously identified parental deficiencies." Instead, the court found that the mother "continues to have the same issues that she had at the January 2018 termination trial," which were "mental health, possible substance abuse, and lack of understanding of appropriate parental functions and how to care for the child." The court found

that she "presents the same threat to this child's safety and welfare" and "remains unable to adequately understand the child's needs and care for them." The court concluded that B.S. was dependent under RCW 13.34.030(6)(c).[1] It ordered the mother to participate in previously ordered services including a substance abuse evaluation, random urinalysis testing, parenting classes, trauma-specific mental health counseling, domestic violence support and vocational training. The court also ordered her to undergo a neuropsychological evaluation, maintain a stable living environment, permit inspection of her living environment by the Department, complete a background check, and sign releases of information for all service providers.

The mother gave birth to her sixth child, M.S. She did not receive any prenatal care during her pregnancy with M.S. Nurse practitioner Brandi Aemisegger testified that, per hospital policy, when a mother has had no prenatal care, "it's definitely a red flag, and it causes a social worker consult automatically." When Aemisegger told M.S.'s mother and father that the hospital wanted to keep M.S. for one more day to check for potential drug withdrawal, the father became very aggressive, cursing and screaming at Aemisegger. Aemisegger requested hospital security escort the father out of the hospital.

---

[1] The mother appealed the order of dependency as to B.S., which was affirmed by a commissioner of this court. She petitioned for discretionary review, and the Washington Supreme Court accepted review on the issue of "whether collateral estoppel applies to findings entered in a termination proceeding concerning older siblings, for purposes of determining whether a younger sibling is a dependent child as defined by RCW 13.34.030(6)(c)." Comm'r's Ruling, In re Dependency of B.S., No. 98825-1, at 3 (Wash. Sept. 15, 2020).

Department social worker Rachel Nanfito went to the hospital to meet with M.S.'s mother. Nanfito asked her if she had been using drugs, because "there was a report of positive methamphetamine screen on July 11th during an emergency room visit." The mother denied having used methamphetamine. She argued that it was "a false positive," and that she "was told that it could have been a false positive due to marijuana use." Nanfito tried to discuss infant care with her, but the mother ignored her and texted on her phone.

The Department petitioned for a dependency order, asserting that M.S. was dependent under RCW 13.34.030(6)(c). The petition alleged as a basis for dependency that "[t]he parents do not have custody of their older children, have not been participating in court ordered services through the Department, and there are ongoing concerns about their ability to parent, substance use and mental health." The petition alleged that the mother had no prenatal care during the pregnancy, that she had a positive urinalysis test for methamphetamine four days before the birth, and that she refused to engage in discharge planning for M.S. The petition also noted that the father was required to leave the hospital due to his aggressive behavior. Otherwise, the petition outlined the parents' history with the Department and the facts of the prior dependency cases.

At a shelter care hearing on the petition, the court ordered M.S. remain out of his mother's care pending the trial.[2] The court based its decision on four factors: (1) the mother's inability to "present a suitable living environment;" (2) "the parents' history of multiple dependencies and recent court findings that the parents are not

---

[2] M.S. was placed in the same foster home as B.S.

in compliance and have not made progress in the sibling [B.S.]'s case;" (3) that "existing parental deficiencies remain related to substance use and chemical dependency and mental health;" and (4) the mother's "lack of prenatal care." The parents did not agree to participate in any services, and so the court ordered none in M.S.'s case.[3]

Renee Boyd, the Department social worker for B.S. and M.S., had extreme difficulty working with the parents. The mother refused to speak to Boyd at court hearings, or to have in-person meetings with her. When Boyd offered to help the mother complete her background check and apply for vocational services, as required by the court order, she refused, saying she was too busy. The father also refused to speak with Boyd or to sign a release of information so she could speak with his service providers. When Boyd asked the father after a court hearing to sign a release of information, he told her he would break her nose. Observing the father's clenched teeth and clenched fists, Boyd was genuinely concerned he would hurt her. The parents also refused to meet with Leslie Gilbertson, the attorney guardian ad litem for both B.S. and M.S.

The mother's engagement with services remained poor. She completed only two urinalysis tests, both of which were positive for marijuana. She told Boyd she was seeing a counselor named Mark, but never provided Boyd with Mark's last name or signed a release of information so Boyd could contact him.

---

[3] See RCW 13.34.065(4)(j) ("[t]he court may not order a parent to undergo examinations, evaluation, or services at the shelter care hearing unless the parent agrees to the examination, evaluation, or service.").

The mother never had stable housing, and her family members told Boyd that she was "couch surfing."

Both parents visited with M.S. consistently.[4]  Boyd believed that the parents loved their children.  But Boyd testified that there had not been much improvement in their parenting abilities during the dependency proceedings for B.S. and M.S., and the visits "continue to be fairly chaotic."  For example, the mother did not consistently change diapers without being reminded.  She often would not feed M.S. enough during visits, causing him to cry with hunger afterward.  The visit supervisor noted that the mother would sometimes wake M.S. to play with him instead of allowing him to sleep, and did not always provide proper head support when holding him.

Trial on the petition took place on October 30 and 31, 2019, at which time M.S. was three months old and B.S., already dependent, was 18 months old. The court heard testimony from six witnesses – the mother, the father, Boyd, Nanfito, Aemisegger, and Gilbertson – and reviewed 35 exhibits.

Boyd testified that the mother's parental deficiencies were a lack of parenting skills, mental health issues, and "an unwillingness to engage."  When asked what the mother's "parenting weaknesses" were, Boyd answered: "Her ability to read the cues of this small infant when they're hungry, tired, needing a diaper change."  Boyd opined that the mother was unable to safely parent M.S.

---

[4] The parents' visitation schedule provided for some visits with only M.S., some visits with only B.S., and some visits with both children together.

because of her "mental health issues," her "inability to read the children's cues," and "[l]ack of safe and stable housing."

The mother denied having any parental deficiencies. She believed that she had no responsibility for the fact that B.S. and M.S. had been removed from her care. When asked why her parental rights to her older children had been terminated, she said, "I'm pretty sure I did a million things wrong," but could not identify any of them. Nor could she identify anything she had learned from the parenting classes.

The mother did not believe she had mental health problems or any mental health diagnoses. When asked about the incident where the father was thrown out of the hospital, she testified that she did not find his behavior inappropriate, and blamed the nurse for being "really disrespectful." The mother also denied problems with substance abuse. She testified she used marijuana about three times a week, and had used it for nausea throughout her pregnancy with M.S. She denied having ever used any other drugs. The attorney for the Department asked her, "Are you aware that you tested positive for methamphetamines during your pregnancy?" She responded, "I do, or I am, but I think that was a false positive." The Department's attorney asked, "Any idea how that might have occurred?" The mother stated, "All I can think of is that I was smoking out of my friend's weed pipe."

On November 27, 2019, the trial court issued a ten-page order concluding that M.S. was a dependent child under RCW 13.34.030(6)(c). The

court's order contains 132 findings of fact supporting its conclusion. As to the

mother's mental health, the court found as follows:

> 2.2.14.   The mother did engage in a psychological evaluation with a parenting component with Dr. Sierra Swing. Dr. Swing completed her report on September 29, 2017. Dr. Swing diagnosed the mother with posttraumatic stress disorder with dissociative symptoms, other specified personality disorder with mixed personality features, and borderline intellectual functioning. The mother has complex trauma resulting from multiple traumas over the course of her life. Dr. Swing testified that a person has to believe that he or she might need some help or that there is room for improvement in order to infiltrate the person's thinking, reasoning, and understanding, and that there seemed to be a disconnect with the mother. Dr. Swing found this concerning. The mother has a tendency to blame things on others, which impacts her ability to take ownership of things which might not have been the best parenting strategy and impacts her willingness to learn something different or more effective. The mother needs to learn skills to cope with life, which can happen with most any counselor. There are more specific treatments, but until she learns to deal with fundamental things, it's hard to have progress. Dr. Swing recommended that the mother engage in any kind of counseling to begin addressing basic issues. Any counseling for the mother should be trauma-informed. No specific modality of treatment, such as CBT or DBT or any other specific modality, was necessary for the mother. The mother just needed to start in counseling to have a place to express and work through some of the emotions that people have. The mother needed to start to be able to identify emotions, form insight into her own emotions and difficulties, and recognize the impact that her behavior has on others. She needs to understand how those factors have played a role in her life.

The trial court also made these findings on the mother's drug use:

> 2.2.34.   On July 11, 2019, the mother tested positive for methamphetamines at an emergency room.

> 2.2.35.   The mother did not have an explanation for the test for methamphetamines prior to the child's birth, except that it was a false positive.

2.2.36.  At the time of delivery, the mother was screened for drug use. Her test was negative for methamphetamine but positive for THC.

2.2.37.  The mother acknowledged, in her testimony for this trial, regular use of marijuana three times per week. The mother testified that she thought that using marijuana made her smarter.

. . .

2.2.97.  Both parents appear to have chemical dependency issues, including problematic use of marijuana, but possibly other issues as well.

2.2.98.  The parents' reported marijuana use is excessive and may indicate problems or a dependency on marijuana. Use of marijuana is not illegal. However, just as with alcohol, it can be used in ways that are not helpful and represent a dependency and a disability in the sense that it is having an impact on functioning. A way to determine that is to complete a drug/alcohol evaluation, which they have not done. Also based on the frequency reported, the parents would almost always be under the influence of marijuana.

. . .

2.2.101.  The mother tested positive for methamphetamines during her pregnancy, has failed to engage in a drug/alcohol evaluation, and has not attended all referred UAs.

The court concluded that the mother's failure to work with the Department or fully participate in services had prevented her from addressing the parental deficiencies identified in the earlier dependency cases:

2.2.110.  The mother continues to have the same issues that she had at the January 2018 termination trial. She has not addressed them. She presents the same threat to this child's safety and welfare.

2.2.111.  Both parents continue to have the same issues that they had when dependency was established regarding [B.S.]. They have not addressed them. They present the same threat to this child's safety and welfare.

2.2.112.  The mother does not have an ability to read a child's cues, to respond in a developmentally appropriate way, or to put her child's needs before the needs of herself or her relationships.

10

2.2.113. The mother has not demonstrated a capacity to meet [M.S.]'s basic needs.

2.2.114. The mother's parental deficiencies remain mental health, substance abuse, and lack of understanding of appropriate parental functions and how to care for a child.

2.2.115. The mother has experienced a tremendous amount of trauma in her life and has not taken the steps to address that to the point where she is able to function as a parent and meet her children's needs.

. . .

2.2.120. The parents lack insight into what the issues that interfere with their parenting of their older children and during this case regarding their parenting of [M.S.].

2.2.121. The parents have been marginally willing to work on correcting their deficiencies or really even acknowledging that they have deficiencies.

The mother appeals.

ANALYSIS

A. Sufficiency of Evidence

The mother first contends the Department failed to present sufficient evidence to establish a finding of dependency. She challenges several of the trial court's findings about her mental health, drug use, and ability to safely care for a baby. A review of the evidence at trial shows that substantial evidence supports the trial court's findings, which in turn support its conclusion that M.S. was a dependent child based on RCW 13.34.030(6)(c).

"Dependency proceedings are designed to protect children from harm, help parents alleviate the problems that led to intervention, and reunite families." In re Dependency of P.H.V.S., 186 Wn. App. 167, 181, 339 P.3d 225 (2014). A "dependent child" is a child who (a) has been abandoned, (b) is abused or neglected, or (c) has no parent, guardian, or custodian capable of adequately

caring for the child, such that the child is in circumstances that constitute a danger of substantial damage to the child's psychological or physical development. RCW 13.34.030(6).[5] For a trial court to find a child dependent, the State must prove by a preponderance of the evidence that the child meets the statutory definition of dependency under RCW 13.34.030(6). In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). Preponderance of the evidence means "more likely than not to be true." In re Dependency of M.S.D., 144 Wn. App. 468, 478, 182 P.3d 978 (2008).

In evaluating a claim of insufficiency of the evidence in a dependency proceeding, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. In re Dependency of C.M., 118 Wn. App. 643, 649, 78 P.3d 191 (2003). Evidence is substantial if, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact proved by a preponderance of the evidence. E.L.F., 117 Wn. App. at 245. We do not reweigh the evidence or make witness credibility determinations. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006). We treat unchallenged findings of fact as verities on appeal. In re Dependency of P.D., 58 Wn. App. 18, 30, 792 P.2d 159 (1990).

Here, the court found the mother's parental deficiencies were "mental health, substance abuse, and lack of understanding of appropriate parental

---

[5] The definition also includes RCW 13.34.030(6)(d), "[i]s receiving extended foster care services, as authorized by RCW 74.13.03," which does not apply here.

functions and how to care for a child." The mother contends that none of these findings were supported by substantial evidence.

A finding of dependency based on RCW 13.34.030(6)(c) does not require a finding of parental unfitness. Instead, the provision allows for "consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs." In re Dependency of Schermer, 161 Wn.2d 927, 944, 169 P.3d 452 (2007). There are no specific factors the court must consider when determining whether a parent is capable of adequately parenting a child. Schermer, 161 Wn.2d at 952. Rather, the inquiry is highly fact specific. Schermer, 161 Wn.2d at 952. The statute "does not require proof of actual harm, only a 'danger' of harm." Schermer, 161 Wn.2d at 951. On review, this court may look at "the constellation of facts presented in this case as a whole, in the light most favorable to the" Department, to determine whether a rational person could conclude that a parent's inability to meet a child's needs poses a danger of harm to the child. Schermer, 161 Wn.2d at 952.

As to her mental health, the mother does not challenge the court's findings related to Dr. Swing's diagnosis. Instead, she says that the Department offered no evidence about the current state of her mental health. She contends that Dr. Swing's evaluation, completed two years before the trial, could not show a current parental deficiency.[6] Thus, the mother says the court's finding that she

---

[6] The mother appears to assert that the Department could have gained more current insight into her mental health if it had referred her for the neuropsychological evaluation ordered in B.S.'s dependency case. But as this court held in the mother's appeal of the order terminating her parental rights to her older children, the neuropsychological evaluation was not a necessary service, and offering such a service

had "not taken the steps to address" her trauma to better "function as a parent and meet her children's needs" was not supported by sufficient evidence in the record.

But Dr. Swing concluded that the mother would not make progress on her mental health until she believed that "she might need some help" or that "there is room for improvement." Dr. Swing also determined that the mother's "tendency to blame things on others" affected her ability to own mistakes and learn new coping strategies. According to Dr. Swing, until the mother was able to "identify emotions, form insight into her own emotions and difficulties, and recognize the impact that her behavior has on others," she could not make progress. The mother does not challenge these findings and we accept them as verities on appeal.

The evidence at trial showed that there had been little to no change in the mother's mental health since Dr. Swing's evaluation. Although she testified that she had seen two counselors, she could not explain what they had worked on or how it had been helpful. The trial court found that "[n]o information was provided to the court to suggest that any work the mother has completed with Mr. Flowers [sic] or 'Mark' has had an impact on her previously identified parental deficiencies." The mother does not challenge this finding and we consider it a verity.

---

to her would have been futile. See In re Dependency of S.R.P.W., noted at 7 Wn. App. 2d 1012 (2019).

Nor did the mother appear to have gained insight into her mental health or why her children had been removed from her care. She denied having any mental health issues. When asked whether she had any responsibility for the fact that B.S. and M.S. had been removed, she responded, "No." She was unconcerned about the father's threatening and aggressive behavior at the hospital, and believed it was an appropriate reaction. The Department presented sufficient evidence for the trial court to conclude that the mother's mental health continued to impair her ability to parent M.S.

The mother raises two claims of error on the trial court's findings about her substance abuse. First, she challenges the sufficiency of the evidence supporting the trial court's finding that her use of marijuana was "problematic," "excessive," and would lead to her "almost always be[ing] under the influence of marijuana." She contends that M.S. was born healthy, and there was no evidence she ever showed up to visits with M.S. under the influence or that her use of marijuana impacted her ability to parent. But the mother herself testified that she used marijuana up to three times a week. She testified that she did not consider marijuana a drug, and believed Dr. Swing had recommended she smoke marijuana. And the only two urinalysis tests that she submitted during M.S.'s dependency case were both positive for marijuana. The trial court noted in its oral ruling that the only way to determine the true extent of the mother's dependence on marijuana was for her to consistently attend urinalysis appointments and undergo a substance abuse evaluation, which she refused to do. While the trial court's use of the words "almost always" may have been a

15

slight exaggeration, the evidence was clear that the mother used marijuana often and had no insight into its potential effect on her parenting.  The trial court's finding that the mother's marijuana use impacted her ability to parent was supported by substantial evidence.

Second, the mother claims that sufficient evidence did not support the court's finding that she tested positive for methamphetamine during her pregnancy with M.S.  This is so, she says, because the Department did not offer the test results into evidence and thus there was no non-hearsay evidence of the positive test.  But the mother herself admitted at trial that she tested positive for methamphetamine.  She speculated that it was a "false positive" because of her marijuana use, but she did not dispute the existence of the positive result.

Thus, the mother's reliance on In re Dependency of W.W.S., 14 Wn. App. 2d 342, 469 P.3d 1190 (2020), is misplaced.[7]  There, this court held that hearsay testimony that the mother was a prior drug addict and had been seen regularly at a "known drug house" was insufficient to support the court's order that the mother submit to urinalysis testing because it was unclear how long ago the mother had used drugs or how it was "known" that she had gone to a "drug house."  14 Wn. App.2d at 366.  But here, the mother acknowledged testing positive for methamphetamine four days before giving birth to M.S.  The trial court's finding about methamphetamine use was supported by the evidence.

---

[7] The mother cites this court's original opinion in W.W.S., which was withdrawn and superseded by a later opinion

16

The mother also challenges the trial court's findings about her parenting abilities. She challenges findings that she lacked "understanding of appropriate parental functions and how to care for a child," that she "does not have an ability to read a child's cues," and that she "has not demonstrated a capacity to meet [M.S.'s] basic needs." She says that these findings stemmed from other findings about safety concerns during visits, which were not supported by the evidence. But the record contains evidence that the mother did not feed M.S. enough, even when prompted to do so. The visit supervisor's notes show that the mother sometimes fed M.S only a half-ounce or ounce of formula at the visit. After these visits were over, M.S. would cry loudly with hunger, and when the visit supervisor fed him, he would quickly drink several ounces of formula and become content. While the mother claims she cannot be responsible for M.S.'s hunger after the visits because she was not present, it was reasonable for the trial court to infer that she had not fed M.S. enough during the visit. Gilbertson, who observed several of the parents' visits, testified that the mother did not always hold M.S. with proper head support. Finally, Boyd testified that the parents did not change diapers often enough without prompting, or allow M.S. to get enough sleep.

The mother says that the visit notes also contain several examples of good parenting, and we agree. But we defer to the trial court's credibility determinations and do not reweigh the evidence. C.B., 134 Wn. App. at 953. Substantial evidence supported the trial court's findings that the mother would have trouble meeting M.S.'s basic needs.

Finally, the mother says that the trial court improperly relied on her history with the Department rather than focus on her current parenting ability. But the trial court did not base its finding of dependency exclusively on the mother's history. Instead, the trial court found that there had been no improvement in the parental deficiencies identified in the mother's prior dependency proceedings. The trial court's findings were supported by the observations of Boyd, Gilbertson, and the visit supervisor, as well as the mother's own testimony at trial. The mother does not establish error.

B. Due Process Right to Notice

The mother next contends that she was denied her due process right to notice because the dependency petition did not allege safety concerns at visits as a basis for dependency. We conclude that the mother received adequate notice and there was no due process violation.

A parent's right to the "custody, care, and companionship" of their children cannot be abridged without due process of law. In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992). In the context of a dependency proceeding, due process requires that parents have "notice of the specific issues to be considered . . . to prevent surprise, helplessness and disadvantage." In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014) (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)).

The mother says that the dependency petition, filed on July 29, 2019, contained only allegations before that date, including the events surrounding M.S.'s birth on July 27. But, she says, a number of the trial court's findings

involve safety concerns at the visits after M.S.'s birth.[8]  She contends that she was denied adequate notice because the Department did not plead these concerns in the original petition, nor did they amend the petition.  Relying on In re Dependency of A.J., 189 Wn. App. 381, 357 P.3d 68 (2015), the mother says that a dependency fact-finding trial is held "on the petition" and cannot involve facts not alleged in the petition.

But the holding of A.J. is not so broad.  In A.J., the dependency petition alleged the child was dependent under RCW 13.34.030(6)(c) ("no parent capable") and the case proceeded to trial on that statutory ground alone.  189 Wn. App. at 403.  Six months later, the Department sought, through a motion hearing, a finding of dependency under RCW 13.34.030(6)(a) ("abandonment"). Id.  This court held it violated the parent's right to due process because the statutory grounds were not pleaded in the dependency petition and the parent

---

[8] The mother specifically challenges these findings:

2.2.89. Both parents sometimes have difficulty in discerning safety issues.

2.2.90. For example, the father placed [B.S.] on his shoulders for a shoulder ride without holding him appropriate, which is not age-appropriate for [B.S.].  The parents do not always safely hold [M.S.]'s head.

2.2.91. The visit supervisor has occasionally had to intervene to address safety issues, for example one time she had to stop [B.S.] from running into a parking lot.

2.2.92. During visitation, the mother has difficulty reading the baby's cues in order to appropriate[ly] care for him.  For example, the mother is not feeding enough formula.  She will remove the bottle after an ounce or so [and] gives him the pacifier.

2.2.93. The visit supervisor at times has to stop and feed him on the way home because he is inconsolable and hungry.

2.2.94. The visit supervisor attempts to give cues to the mother at times that maybe the child needs more food, but that has not necessarily resolved the issue.

2.2.95. The mother's feeding of [M.S.] at visits has improved recently.

was denied the opportunity to introduce evidence, testify in her own behalf, or examine witnesses. Id. But it did not hold that a trial court is prohibited at a fact-finding trial from considering facts that arose after the filing of the petition when the facts support the statutory ground alleged in the petition.

Contrary to the mother's suggestion, due process does not require that parental deficiencies be expressly alleged in the petition. See In re ParentalRights of F.M.O., 194 Wn. App. 226, 231-32, 374 P.3d 273 (2016). Rather, an appellate court looks to the entire record when determining the adequacy of notice. F.M.O., 194 Wn. App. at 231-32. Here, the record does not show a due process violation. The statutory grounds for the Department's dependency allegation –RCW 13.34.030(6)(c) – were adequately pleaded in the petition. And the petition alleged a history of safety concerns over the course of the mother's involvement with the Department. It stated that K.R.T.W., S.R.P.W. and K.R.-K.W. had been removed in part because of "lack of adequate supervision" and "lack of parenting skills." The petition also stated, as for K.R.T.W., S.R.P.W. and K.R.-K.W.: "The mother's visits were fully supervised for the entire case and this level was necessary because the mother needed a lot of assistance. Visitation was so problematic that the court reduced the mother's visits to once per month." The petition alleged that these concerns remained "ongoing." Also, the petition was filed in July 2019, only a few months after B.S.'s dependency trial in February 2019, at which the Department had alleged that the mother could not safely care for a baby. The trial court found, as for B.S., that she "remains unable to adequately understand the child's needs and

care for them" and "has not demonstrated a capacity to meet [B.S.]'s basic needs." The court also found, as for B.S., that the mother's "parental deficiencies remain mental health, possible substance abuse, and lack of understanding of appropriate parental functions and how to care for the child." While it would have been best practice for the Department to amend its petition to include the specific issues arising at the visits with M.S., we conclude that the mother received adequate notice that her ability to provide safe and appropriate care for a baby would be at issue at the dependency trial.[9]

Affirmed.

_____
Chun, J.

WE CONCUR:

_____        _____

---

[9] See JuCR 3.5 (providing that a dependency petition "may be amended at any time" and "[t]he court shall grant additional time if necessary to insure a full and fair hearing on any new allegations in an amended petition").